In the

# United States Court of Appeals
### For the Seventh Circuit

No. 05-1344

JUN YING WANG,

*Petitioner,*

*v.*

ALBERTO R. GONZALES, Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A 78 237 820

ARGUED OCTOBER 28, 2005—DECIDED APRIL 28, 2006

Before EASTERBROOK, MANION, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Jun Ying Wang, a native of the People's Republic of China, entered the United States in July 1997 on a one-month temporary nonimmigrant visitor's visa, which she overstayed. She was still in the United States in October 2001, when she was convicted for her part in a scheme to obtain Social Security cards using fraudulent documents. Consequently, the Department of Homeland Security issued Wang a Notice to Appear ("NTA"), charging her with removability for overstaying her visitor's visa, being convicted of a crime of moral turpitude, and violating 18 U.S.C. § 1546 (prohibiting fraud and misuse of visas,

permits, and other entry documents). In response, Wang admitted the allegations in the NTA, conceded removability, and applied for asylum, withholding of removal, and protection under the United Nations Convention Against Torture ("CAT"). She based her request on her fear that if she returned to China, she would be attacked by her codefendants in the Social Security fraud scheme, who sought retribution against her because she had cooperated with authorities and received a more lenient sentence. The Immigration Judge ("IJ") denied Wang's requests for relief, and the Board of Immigration Appeals ("BIA") summarily affirmed. Wang now petitions for review of the BIA's decision, and we deny the petition for review.

## I.

Wang testified through an interpreter at a hearing held by an IJ on February 20, 2004. Much of the hearing was dedicated to Wang's explanation of her participation and subsequent conviction in the Social Security card scheme. She claimed that she became involved in April 2001 when her then-boyfriend, Yonghong Guo, asked her to take a fake passport and "receipt" to the Social Security office to pick up a Social Security card. Wang maintained that she had never used a fake passport to obtain a Social Security card before, but that Guo and a friend of his, Wei Chu, had previously obtained Social Security cards by presenting fraudulent identification documents such as passports, I-94 forms, and nonimmigrant visas.

In May 2001 Wang, Guo, and Chu were charged together in a thirty-two count indictment with violating 18 U.S.C. §§ 1543 (prohibiting forgery or false use of a passport), 1546(a) (prohibiting use of forged or counterfeit nonimmigrant visas), 1028(a)(6) (prohibiting knowingly possessing a United States identification document produced without lawful authority) *amended by* PL 109-177,

Mar. 9, 2006 (120 Stat. 192), and 42 U.S.C. § 408(a)(6) (forbidding knowingly furnishing false information to the Commissioner of Social Security). Wang testified before the IJ that after the three of them were arrested, she provided prosecutors with information about the conspiracy. Specifically, she claimed to have told prosecutors how and where the fake documents were produced and who was involved. She also told prosecutors about the computer that Guo and Chu had used to create the fraudulent "passport visas" and I-94 cards. Finally, Wang testified that she told prosecutors about a fourth individual, Shi Wei Min, who had stepped in and taken over the computer after Guo and Chu were arrested.

In October 2001, Wang pleaded guilty pursuant to a written plea agreement to violating 18 U.S.C. §§ 1543, 1546(a), 1028(a)(6), and 42 U.S.C. § 408(a)(6). Guo and Chu also pleaded guilty at that same time. Wang's plea agreement contemplated that she would cooperate fully in the investigation and prosecution of the matters in the indictment, and that if she provided substantial assistance, the United States would consider moving for a downward departure from the United States Sentencing Guidelines on her behalf. At sentencing (in February 2002), the government did move for a downward departure on Wang's behalf, and the court departed downward from the six to twelve-month range called for by the Guidelines and sentenced her to concurrent three-month terms of imprisonment to be followed by two years of supervised release.

At the time of her immigration hearing, Wang did not know whether Guo and Chu had been sentenced or what sentences they received. Presumably, however, they were sentenced shortly before or after Wang, because Wang's presentence investigation report (included with her asylum application) stated that all three would be sentenced together on February 14, 2002. Moreover, Wang

reported that both Guo and Chu had already been removed to China.

In support of her asylum claim, Wang testified that if she returns to China, Guo and Chu will seek retribution against her on account of her cooperation with prosecutors. Wang recounted the following examples to demonstrate Guo and Chu's intentions. First, she testified that while the three were jailed together before she pleaded guilty, some female inmates who moved onto her floor from the floor housing Guo and Chu informed her that the men were offering a reward to beat up Wang. Specifically, the women told Wang that they had been told that the person "[w]ho beat the Chinese girl will get the $200 from the Chinese guy."

Wang also testified that Guo had contacted her from China and threatened her. In April 2003 Guo and another individual (presumably Chu) went to Wang's brother's house in Shenyang and demanded that he call Wang. When Wang's brother resisted, they smashed his television. He then called Wang, and when she answered, Guo was on the line and accused Wang of betraying her friends. He then gave her this ominous warning about returning to China: ". . . as soon as you return to China I will try to look for you and the moment you see me will be the end of your day." Although Wang's brother reported the incident to the police, when they looked for Guo he had moved. According to Wang, Guo also called her brother on several other occasions demanding money.

In response to questioning from the IJ about why Wang could not move so that Guo and Chu could not find her, Wang testified that it would be hard for her to relocate because all of her family is in Shenyang. Further, she maintained that if she were able to move, they would still find her. She also claimed that the police could not adequately protect her because they "cannot be around all the time and they can do things to you and the police in China they only come when after [sic] the thing happened."

In addition to her fear of Guo and Chu, Wang asked the judge to consider the fact that she had married a United States citizen. Unfortunately, after their marriage, Wang's husband was involved in a serious car accident that left him in a vegetative state. Thus, they had never lived together, although Wang's counsel speculated that Wang had some sort of shared guardianship over her husband.

Before rendering his decision, the IJ expressed his concern that Wang had never identified the ground on which she based her claim for asylum. In response to questioning from the IJ on this point, Wang's counsel conceded that her claim did not fit neatly into the categories for asylum—race, religion, nationality, membership in a particular social group, or political opinion. When asked to identify a basis for the claim, counsel responded, "I think we ask the Court to make a determination probably because she provided assistance to the Government." Counsel continued, suggesting that "there should be an exception to the categories of the rules because she provided assistance to the Government of the United States [and] that's the reason why her life will be in danger."

The IJ denied all of Wang's requests for relief. As for her asylum claim, he concluded that although Wang may have a well-founded fear of being harmed in China, her fear was not on account of her race, religion, nationality, membership in a particular social group, or political opinion. Specifically, the IJ considered whether Wang could argue that she is a member of a social group made up of criminal defendants who have cooperated with authorities in the United States. He concluded, however, that such a classification was not the type of social group contemplated under the Immigration and Nationality Act ("INA").

The IJ then rejected Wang's claim that she could not relocate within China so as to avoid contact with her codefendants. The IJ acknowledged that Wang had pre-

sented "limited evidence" that Guo would be able to find her if she relocated and that it is difficult to move freely in China. Nonetheless, the IJ credited the U.S. Department of State Country Report on China, which he claimed established that "there is a floating population in China [of] more than many millions." Further, the IJ concluded from the fact that the police had responded to Wang's brother's complaint that Chinese authorities could provide assistance to Wang if she felt threatened.

Finally, the IJ explained that even if Wang qualified as a refugee, he would deny asylum in his discretion. He concluded that the record contained little favorable evidence to offset Wang's criminal conduct in the United States. First, she had violated the terms of her visitor's visa by staying in the country, and had then engaged in criminal conduct. Moreover, that conduct provided the basis for her entire asylum claim. The IJ also gave very little weight to Wang's marriage to a United States citizen because she had been living with Guo until her arrest and had never lived in the same state as her spouse. Thus, the IJ determined that Wang's husband was unlikely to suffer any undue hardship on account of her removal.

Based on his conclusion that Wang's fear of persecution was not linked to one of the five protected grounds in the INA, the IJ also denied her request for withholding of removal under section 241(b)(3), which requires an alien to demonstrate that her life or freedom would be threatened "*because of* [her] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3) (emphasis supplied). The IJ then rejected Wang's claim for relief under the CAT. Although the CAT does not require a petitioner to show that she fears harm on account of one of the five protected grounds, the immigration regulations require that the harm be inflicted by or with the consent of a public official or individual acting in an official capacity. *See* 8 C.F.R. § 208.18(a)(1). Since Wang

feared harm only from her codefendants, who are private citizens, the IJ concluded that she was ineligible for relief under the CAT. Finally, the IJ relied on Wang's criminal record to conclude that she was ineligible for voluntary departure. The BIA affirmed without opinion, and Wang petitions this court for review.

## II.

On appeal, Wang challenges only the IJ's denial of her request for asylum. Thus, we need not revisit the IJ's conclusion that she was ineligible for withholding of removal or relief under the CAT. *See Vasile v. Gonzales*, 417 F.3d 766, 767-68 (7th Cir. 2005) (petitioner abandoned requests for withholding of removal and relief under the CAT by failing to raise them in opening brief). Where, as here, the BIA summarily affirms the decision of the IJ, we review the IJ's decision directly to determine if it is supported by substantial evidence. *Feto v. Gonzales*, 433 F.3d 907, 911 (7th Cir. 2006); *Sosnovskaia v. Gonzales*, 421 F.3d 589, 592 (7th Cir. 2005). Under the substantial evidence test, we will affirm the IJ's decision if it is "'supported by reasonable, substantial, and probative evidence on the record considered as a whole,'" *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 (1992), and will overturn it only "if the record compels a contrary result," *Tapiero de Orejuela v. Gonzales*, 423 F.3d 666, 671 (7th Cir. 2005) (citation and internal quotations omitted).

To qualify for asylum, an alien must demonstrate that she is a refugee, which is defined in the INA as one "who is unable or unwilling" to return to her country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *see also Hernandez-Baena v. Gonzales*, 417

F.3d 720, 722-23 (7th Cir. 2005). Thus, Wang must make two showings. First, she must establish that she has suffered past persecution or has a well-founded fear of future persecution. Second, she must show that the persecution she endured (or fears she will endure) is "on account of" one of the five statutorily protected grounds. *See Ciorba v. Ashcroft*, 323 F.3d 539, 545 (7th Cir. 2003); *Tamas Mercea v. Reno*, 222 F.3d 417, 423 (7th Cir. 2000). Once an applicant has demonstrated her eligibility for asylum, the IJ ultimately retains discretion to deny relief. *See* 8 U.S.C. § 1158(b)(1)(A) ("Secretary of Homeland Security or the Attorney General *may* grant asylum to an alien who has applied for asylum.") (emphasis added); *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 444 (1987) (Aliens who "can only show a well-founded fear of persecution are not *entitled* to anything, but are *eligible* for the discretionary relief of asylum.") (emphasis in original); *Groza v. I.N.S.*, 30 F.3d 814, 821 (7th Cir. 1994) (same).

Wang's primary argument on appeal is that "the definition of 'refugee' should be construed to cover" her. She asserts without elaboration that she should be eligible for asylum because she now fears harm on account of her assistance to the United States government. But instead of explaining how her fear of harm is linked to one of the grounds in the INA, Wang argues simply that in rejecting her claim the IJ defined refugee and persecution too "rigidly." She argues that instead of focusing on whether she could demonstrate her membership in a social group, the IJ should have focused on this court's definition of persecution as "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *E.g.*, *Lhanzom v. Gonzales*, 430 F.3d 833, 848 (7th Cir. 2005) (citation and internal quotations omitted).

Wang's focus on the definition of "persecution" is unhelpful because, as set forth above, demonstrating persecution

is only part of the equation. The more critical element to Wang's claim is the one that she fails to address: the statutory requirement that the persecution be *on account of* one of the five enumerated grounds. As the IJ recognized in his opinion, it may be that Wang's codefendants wish to harm her.[1] It is doubtful whether any harm they may inflict, based as it is on personal animosity, could amount to "persecution." *See Hor v. Gonzales*, 400 F.3d 482, 485 (7th Cir. 2005) ("Persecution is something a *government* does, either directly or by abetting (and thus becoming responsible for) private discrimination by throwing in its lot with the deeds or by providing protection so ineffectual that it becomes a sensible inference that the government sponsors the misconduct."), *rev'd on reh'g on other grounds*, 421 F.3d 497 (7th Cir. 2005). We need not, however, decide that issue because even if Wang could demonstrate a well-founded fear of persecution, her claim would still falter at the "on account of" inquiry. Although we are sympathetic to the fact that Wang's life may indeed be in danger, she is still obligated to demonstrate the required nexus between her fear of harm and the grounds enumerated in the INA. *See Tamas-Mercea*, 222 F.3d at 425 ("[T]he asylum statute requires more than simply persecution; it requires persecution 'on account of' one of the five protected statutory grounds.") (internal quotations omitted); *Marquez v. I.N.S.*, 105 F.3d 374, 380 (7th Cir. 1997) ("Without a firm footing in one of the five protected bases, asylum law offers no succor."); *cf. Elias-Zacarias*, 502 U.S. at 483-84 (plain

---

[1] Since Wang's claim ultimately hinges on whether or not any persecution feared would be "on account" of a protected ground, it is unnecessary to decide whether she has established a well-founded fear. We note, however, that except in the "most extreme circumstances" threats alone are insufficient to demonstrate persecution. *See Mitreva v. Gonzales*, 417 F.3d 761, 764 (7th Cir. 2005).

language of asylum statute requires petitioner to show persecution "*because of . . .* political opinion") (emphasis in original). Her failure to do so dooms her claim.

Our conclusion is reinforced by counsel's admission at Wang's hearing that her claim is essentially a personal dispute. When the IJ questioned Wang's counsel as to the basis of Wang's claim for asylum, he explained that Wang based her claim on her cooperation with authorities here in the United States. Wang's counsel continued, saying, ". . . what would the basis be? It sounds like a personal retribution or personal grudge." This circuit and others, however, have repeatedly held that a personal dispute cannot give rise to a claim for asylum. *See Marquez*, 105 F.3d at 380 ("A personal dispute, no matter haw nasty, cannot support an alien's claim of asylum."); *see also Iliev v. I.N.S.*, 127 F.3d 638, 642 (7th Cir. 1997) (same); *Setiadi v. Gonzales,* 437 F.3d 710, 713 (8th Cir. 2006) ("[A] personal dispute without connection to government (in) action is not usually grounds for a finding of past persecution."); *Romilus v. Ashcroft*, 385 F.3d 1, 6 (1st Cir. 2004) ("The INA is not intended to protect aliens from violence based on personal animosity."); *Abdille v. Ashcroft*, 242 F.3d 477, 494 (3d Cir. 2001) ("[A]cts of private violence . . . fall short of persecution on account of race, nationality, or membership in a particular social group."). As the BIA explained, "an alien who succeeds in establishing a well-founded fear of persecution will not necessarily be granted asylum. He must also show that the feared persecution would be on account of his race, religion, nationality, membership in a particular social group, or political opinion. Thus, for example, aliens fearing retribution over purely personal matters . . . would not qualify for asylum. Such persons may have well-founded fears, but such fears would not be on account of their race, religion, nationality, membership in a particular social group, or political opinion." *Matter of Mogharrabi*, 19 I. & N. Dec. 439, 446 (BIA 1987), *abrogated on other grounds by*

*Pitcherskaia v. I.N.S.*, 118 F.3d 641, 647-48 (9th Cir. 1997). Just so with Wang.

It is undisputed that Guo and Chu wish to harm Wang. Wang, however, admits that they do not seek to do so "on account of" her membership in a particular group or for any political opinion, but rather for her decision to cooperate with the government in an attempt to reduce her own sentence. *See Saldarriaga v. Gonzales*, 402 F.3d 461, 468 (4th Cir. 2005) (any persecution petitioner "faces is due to the fact of his cooperation with the government, rather than the content of any opinion motivating that cooperation"). Despite this admission, Wang provides no explanation as to how we could interpret the statute in a way to include her claim, nor does she offer any authority to support her assertion that the IJ "should have treated [her] as a 'refugee' by extending the application of the law." *See, e.g.*, *United States v. Turcotte*, 405 F.3d 515, 536 (7th Cir. 2005) ("In this circuit, unsupported and undeveloped arguments are waived."). Although Wang's situation is unfortunate, it is one that she presumably shares with countless other criminal defendants here in the United States. Like many other criminal defendants, Wang chose to cooperate with prosecutors in the hope of receiving a reduced sentence, which she did. That choice carries the inherent risk that an angry codefendant will seek retribution. *See United States v. Jones*, 34 F.3d 495, 500 (7th Cir. 1994) (recognizing that defendant's cooperation posed "considerable risk" to defendant but that he was "rewarded handsomely for it"). We do not rule out the possibility that there may be some circumstance in which an applicant's assistance to the United States puts her at risk of harm on account of a statutorily protected ground, but Wang has not argued as much here, and we are not at liberty to rewrite the statute so as to

include her claim.[2] Substantial evidence thus supports the IJ's conclusion that Wang is ineligible for asylum.

In light of our conclusion that Wang has failed to link the treatment she fears to one of the statutorily protected grounds, we need not reach the IJ's discretionary denial of asylum. Nor do we address his alternate bases for denying asylum: first, that the Chinese authorities could adequately protect Wang if necessary, and second, that Wang would be able to relocate to avoid contact with Guo and Chu. We note, however, that Wang makes no mention of these independent reasons the IJ gave for denying her claim, thus abandoning any challenge to the conclusions that she may have had. *See Vladimirova v. Ashcroft*, 377 F.3d 690, 694 n.1 (7th Cir. 2004).

**III.**

For the foregoing reasons, we DENY the petition for review.

---

[2] We note that there are alternatives to asylum for an alien placed in danger by virtue of her cooperation with the government. Although it did not do so in this case, the government may seek an "S-visa" on behalf of an alien cooperating in a criminal investigation. *See* 8 U.S.C. § 1101(a)(15)(S)(i); *United States v. Zendeli*, 180 F.3d 879, 881 (7th Cir. 1999) ("The government also agreed to recommend to Immigration officials that [defendants] receive S-visas to help them avoid deportation . . . after they completed their sentences.").

No. 05-1344                                                    13

A true Copy:

    Teste:


                            _____
                          *Clerk of the United States Court of*
                          *Appeals for the Seventh Circuit*