In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-2530

JOHN S. BOCTOR,

*Petitioner,*

*v.*

ALBERTO R. GONZALES,

*Respondent.*

Petition for Review of an order of the
Board of Immigration Appeals.
No. A78-637-924

SUBMITTED JUNE 9, 2006—DECIDED JANUARY 24, 2007

Before RIPPLE, MANION, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* John (Yohanna) Boctor, a Coptic Christian, petitioned for asylum and other immigration relief based on death threats and assaults he suffered in his native Egypt at the hands of Muslim extremists. Boctor testified at his immigration hearing that he was repeatedly threatened with beheading and twice was violently attacked and beaten for refusing to disclose the whereabouts of a fellow Coptic Christian and his wife, a Muslim woman who converted to Christianity upon the couple's marriage. An immigration judge ("IJ") found Boctor credible, but concluded that his attackers targeted him for reasons unrelated to religion and therefore he had not suffered religious persecution. The Bureau of Im-

migration Appeals ("BIA") affirmed, and Boctor petitioned this court for review. Because the agency's determination that Boctor was not persecuted because of his religion is not supported by substantial evidence, we grant the petition for review.

## I. Background

Boctor was born in Cairo, Egypt, and lived in the Egyptian capital city all his life before coming to the United States in 1999 at the age of twenty-six. After he overstayed his visitor's visa, the government initiated removal proceedings against him, and he timely applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). Boctor conceded removability and an IJ heard the merits of Boctor's claims at a hearing at which Boctor was the only witness. The IJ accepted his testimony as credible, so we summarize the relevant facts based on that testimony.

Boctor is a member of the Coptic Orthodox Christian Church and is readily identifiable as a Copt because of his first name (John or Yohanna) and a crucifix tattoo on his right wrist. He received the tattoo around the age of four, as was customary for children in his Coptic community in Egypt. Boctor's friend and boss, Hanna Mousa, also a Coptic Christian, married a Muslim woman, Gamila Hussein, who converted to Christianity after the marriage. Mousa told only a few of his Christian friends about his marriage and his wife's conversion because he feared reprisals from fundamentalist Muslims who considered conversion from Islam to be a capital offense under Islamic law. Despite the attempt at secrecy, Gamila's relatives and Muslim extremists in the community learned of the marriage and Gamila's conversion, and the couple began to receive death threats. They reported the threats to Egyptian police, but received no assistance. The police

refused to investigate and appeared complacent about the death threats.

Boctor and three other friends then went to the police on behalf of the Mousas, asking the authorities to intervene to protect the couple and threatening to contact international human rights organizations if the police did nothing. Boctor's efforts were unsuccessful, and the Mousas then went into hiding at a location unknown to Boctor. Shortly after Boctor's complaint to the police, he began receiving telephone threats from people who demanded to know the Mousas' whereabouts and threatened to cut his throat if he did not tell them. Boctor believed the callers were part of the same group of Muslim extremists that had been menacing the Mousas. The death threats soon escalated into physical violence. One night on his way home from work, Boctor was attacked by three men. His assailants called him an "infidel," tore his crucifix necklace from his neck, beat him, accused him of "covering up for an infidel and a prostitute," and told him they would kill him if he made a report to any "human rights committees." Boctor said he recognized his three attackers as Islamists by their manner of dress and their long beards.

After this attack, Boctor moved to his uncle's house, also in Cairo, about fifteen minutes away from his own home. His uncle's residence did not provide the safe haven Boctor hoped it would. The same group of Muslim extremists tracked him down there, broke into the house and attacked Boctor and his friends, beating them and demanding to know where the Mousas were hiding. The attackers called Boctor an "atheist" and an "infidel." When Boctor did not disclose the Mousas' location, the assailants said the next time he refused to talk they would kill him. About a month after this second attack, Boctor left Egypt for the United States.

Boctor testified that he fears returning to Egypt because "[s]omething is going to happen to me one of these days. Could be the next day, could be a day after, could be a month later, but they're going to hit me, they're going to abuse me, they're going to insult me . . . and they might kill me." The IJ asked Boctor who he meant by "they," and he answered, "They are the Islamist groups." Boctor did not report either of his attacks to the Egyptian police because he believed they would not help him, just as they failed to protect the Mousas. He testified that based on his interactions with the Egyptian police, they would "of course" acquiesce in the assaults and threats because "the police are Muslims just like them [his attackers]." Boctor believed the police would actually assist the Muslim extremists by giving them information about him.

In addition to Boctor's testimony, the record before the IJ included the State Department's February 2001 country conditions report for Egypt. According to the report, about 6 million of Egypt's 64 million citizens are Christians, most of whom belong to the Coptic Orthodox Church. The report noted that:

> Neither the Constitution nor the Civil and Penal Codes prohibit proselytizing or conversion. However, during the past 2 decades, several dozen Christians who were accused of proselytizing or who had converted from Islam to Christianity have been harassed by police or arrested on charges of violating Article 98(F) of the Penal Code, which prohibits citizens from ridiculing or insulting heavenly religions or inciting sectarian strife.

BUREAU OF DEMOCRACY, HUMAN RIGHTS & LABOR, U.S. DEP'T OF STATE, EGYPT: COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 13 (Feb. 2001). The report also noted occasional violent assaults on Christians by Islamic extremist groups and a public complaint lodged by Coptic

clergy about police "negligence" that led to "an increase in the number of victims and an escalation of violence." *Id.* at 19-20.

Despite finding Boctor's testimony credible, the IJ concluded that his Islamic attackers were motivated not by Boctor's Christianity but by his refusal to inform them of the Mousas' whereabouts. This, the IJ concluded, was not persecution "on account of" religion within the meaning of the asylum statute, 8 U.S.C. § 1101(a)(42). The IJ also found Boctor had not shown it would be unreasonable to expect him to relocate safely within Egypt. Accordingly, the IJ denied Boctor's claims for asylum, withholding of removal, and relief under the CAT. The BIA affirmed in a brief per curiam order, finding no error on the part of the IJ. Boctor petitioned this court for review.

## II. Discussion

Boctor waived his claim under the CAT by not raising it during his appeal to the BIA, so we address only his claims for asylum and statutory withholding of removal. *See* 8 U.S.C. § 1252 (d)(1) ("A court may review a final order of removal only if . . . the alien has exhausted all administrative remedies available to the alien as of right."). We review the BIA's determination that Boctor was not persecuted because of his Christianity for substantial evidence. *Jun Ying Wang v. Gonzales*, 445 F.3d 993, 997 (7th Cir. 2006). Under the substantial evidence standard we will reverse the BIA's decision only if the evidence presented at Boctor's immigration hearing compels a contrary conclusion. The BIA's order was essentially nothing more than an adoption of the IJ's decision and reasoning, so our review focuses directly on the decision of the IJ. *Id.*

In order to be eligible for asylum, an alien must establish that he is unable or unwilling to return to his native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42); 8 U.S.C. § 1158(b)(1). "An applicant who demonstrates past persecution is entitled to a rebuttable presumption of a well-founded fear of future persecution." *Hanaj v. Gonzales*, 446 F.3d 694, 698 (7th Cir. 2006). A well-founded fear of persecution must be subjectively genuine and objectively reasonable; the objective component requires that persecution is a "reasonable possibility," not that persecution is more likely than not. *Gjerazi v. Gonzales*, 435 F.3d 800, 808 (7th Cir. 2006) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430-32 (1987)). If an asylum applicant shows a well-founded fear of persecution if returned to his native country, the decision whether to grant asylum remains vested in the discretion of the executive branch. 8 U.S.C. § 1158(b)(1)(A) ("The Secretary of Homeland Security or the Attorney General *may* grant asylum to an alien who has applied for asylum . . . if the Secretary of Homeland Security or the Attorney General determines that such alien is a refugee.") (emphasis added).

The essence of the IJ's decision is contained in the following passage from her oral order:

> It appears that every instance of an encounter with the Islamic fundamentalists was not because the fundamentalists were trying to persecute the respondent on the basis of his faith or on the basis of his Coptic Christianity, but rather they were trying to find from him information that would lead them to the people they really were interested in and that would be Hanna and his wife. As deplorable as what it is that occurred to [Boctor], and certainly it is not condoned by the Court, I do not believe that the fear that

he has is over his faith or his membership in a particular social group, but really it is based on a purely personal matter.

The IJ thus did not reject Boctor's claim that he had been persecuted by Islamic extremists; to the contrary, she appears to have accepted that the death threats and physical assaults he suffered amounted to persecution within the meaning of the asylum statute. Instead, the IJ held that Boctor had been subjected to this persecution because of his "unfortunate link to his friend Hanna Mousa and his wife, Gamila," not because of his religion. This conclusion completely ignores the factual context in which the death threats and assaults occurred. Boctor's Islamic attackers were pursuing the Mousas in order to carry out religious punishment for their intermarriage and for Gamila's subsequent conversion from Islam to Christianity. Boctor was seen as protecting his coreligionists and as a consequence was targeted for violent retribution and possibly death.

The IJ's decision remarkably omits any mention of the substantial direct evidence linking the attackers' motivation to Boctor's religion. Boctor testified that his assailants were Islamists for whom the issue of religious intermarriage and conversion from Islam was "an issue of religious honor" that must be avenged. "To them," he testified, "I am supposed to be killed and my blood is supposed to be shed in order to resolve the issue once and for all. I have helped my friend and his wife. I have hid them and supported them. We are all supposed to die in order for the honor to be maintained in their religion." He said his attackers called him an "atheist" and an "infidel," ripped the crucifix necklace from his neck, and accused him of protecting other "infidels." These insults were obviously aimed at Boctor's Christian faith—or at least his lack of adherence to Islam—and plainly established that these were religiously motivated attacks.

The IJ also concluded, without explanation, that the State Department's country conditions report made it "unlikely that the persecution [Boctor] claims was on the basis of his Christianity." Aside from the dearth of reasoning on this point, the IJ's assertion ignores information in the report about acts of violence against Egyptian Christians by Islamic extremists, complaints of complicity on the part of the Egyptian police, and occasional police harassment and arrest of Christians for proselytizing or converting from Islam.

The IJ's determination that Boctor was persecuted for reasons unrelated to religion is not supported by substantial evidence and must be reversed. Accepting (as the IJ did) the credibility of Boctor's testimony, the record compels the conclusion that he was persecuted because of his religion. *INS v. Elias-Zacarias*, 502 U.S. 476, 481 n.1 (1992); *Jun Ying Wang,* 445 F.3d at 997.

Boctor's successful demonstration of past persecution on account of his religion entitles him to a presumption that he has a well-founded fear of further persecution if he returns to Egypt. 8 C.F.R. § 208.13(b)(1); *Gjerazi*, 435 F.3d at 808. On remand the government will have the opportunity to rebut that presumption by proving either "a fundamental change in circumstances" in Egypt such that Boctor no longer has a well-founded fear of religious persecution, or that Boctor could avoid persecution by relocating to another part of Egypt and that it would be reasonable to expect him to do so. 8 C.F.R. § 208.13(b)(1)(i). The government bears the burden of proof on both of these issues.[1] 8 C.F.R. § 208.13(b)(1)(ii) ("In cases in which an applicant has demonstrated past

---

[1] The IJ held that Boctor had not shown he could not safely relocate within Egypt, but the burden of proof on this point rests with the government where, as here, the alien has established past persecution.

persecution[,] . . . the Service shall bear the burden of establishing by a preponderance of the evidence" either a fundamental change in circumstances or the reasonableness of safe relocation.).

Unlike asylum, which is discretionary, withholding of removal is a mandatory form of relief: "[T]he Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). But along with the mandatory nature of this form of immigration relief, withholding of removal carries a more stringent burden of proof for aliens. They must establish that their lives or freedom would more likely than not be threatened in the country of removal. *Kobugabe v. Gonzales*, 440 F.3d 900, 901 (7th Cir. 2006) (citing *INS v. Stevic*, 467 U.S. 407 (1984)).

The IJ here concluded that because Boctor had not been persecuted on account of religion, he likewise could not meet the stricter standard of proof to establish his withholding of removal claim. The denial of withholding was therefore premised entirely on the IJ's initial determination that Boctor was not persecuted because of his Christianity, which we have reversed as unsupported by substantial evidence. Because he has shown past religious persecution, on remand Boctor is entitled to a presumption that his life or freedom would be threatened if he returns to Egypt. 8 C.F.R. § 1208.16(b)(1)(i). The government may rebut that presumption by showing by a preponderance of the evidence a "fundamental change in circumstances" in Egypt, or that Boctor could safely relocate within Egypt and that it would be reasonable to expect him to do so. 8 C.F.R. § 1208.16(b)(1)(ii).

For the foregoing reasons, we DENY Boctor's petition for review with respect to his CAT claim. We GRANT the

petition for review with respect to his claims for asylum and withholding of removal and REMAND to the BIA for further proceedings.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*