In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 10-1100 & 10-1101

RASA JONAITIENE AND MARIUS BUBENAS,

*Petitioners,*

*v.*

ERIC H. HOLDER, JR., Attorney General of
the United States,

*Respondent.*

On Petition for Review of the Orders
of the Board of Immigration Appeals.
Nos. A077-651-529, A077-495-492

ARGUED OCTOBER 28, 2010—DECIDED SEPTEMBER 26, 2011

Before MANION, ROVNER, and SYKES, *Circuit Judges*.

ROVNER, *Circuit Judge*. Rasa Jonaitiene and Marius
Bubenas were citizens of Lithuania in 2000, when each
gained entry into the United States through the use
of illegally-obtained visas. They do not dispute that
Bubenas, along with Jonaitiene's brother Daruas
Daugela, arranged to obtain a United States visa from

a man named Darius Reika. Bubenas used that visa to come to the United States in March 2000, and Jonaitiene followed in July of that year. Bubenas and Jonaitiene have three children together, two born in Lithuania and the third born in the United States.

Eventually, the United States government became aware of the visa fraud scheme that included bribery of a United States Foreign Officer in Lithuania to obtain the visas, and the petitioners were both arrested and charged in three counts of a nineteen-count indictment in federal court. The petitioners agreed to cooperate in the investigation and prosecution of other members of the scheme. Based on that cooperation, the government dismissed two counts of the superceding indictment and filed a substantial assistance motion. Petitioners pled guilty to the remaining count and were sentenced to one year of probation. On June 17, 2008, the Department of Homeland Security initiated removal proceedings against petitioners, charging them with removability for being inadmissible at the time of entry and for having been convicted of a crime involving moral turpitude. 8 U.S.C. § 1227(a)(1)(A), 1182(a)(7)(B)(i)(II), and 1227(a)(2)(A)(i). The petitioners conceded their removability, but sought relief from removal through applications for asylum and withholding of removal.

Petitioners contend that they are fearful of returning to Lithuania because of threats from Darius Reika, who resides there, and because the Lithuanian government is either unwilling or unable to protect them. In their written statements as well as their testimony at

the hearing, the petitioners detailed threatening phone calls made to them by Reika after their arrest.

Jonaitiene's brother, who had arranged for the payments to Reika for the visas and who also resides in the United States, received threats from Reika as well, and ultimately committed suicide. The petitioners also introduced evidence that the Lithuanian newspapers had published articles detailing their cooperation in the government investigation into the visa fraud scheme. They asserted that because of that cooperation, they would be in danger from Reika if returned to Lithuania. They also asserted that they would be considered traitors in their country, but could not explain upon questioning why a cooperating witness in a criminal case would be considered a traitor, nor how such cooperation in identifying fraud in the American embassy would be considered a traitorous act against Lithuania.

In addition to the threats from Reika, the petitioners provided evidence that after Jonaitiene's threatening calls, the door to Jonaitiene's mother's apartment was set on fire in Lithuania. The petitioner's children were staying with Jonaitiene's mother at that time. In response to that fire, the United States government brought the children and Jonaitiene's mother to the United States temporarily under Significant Public Benefit Parole. The fire department investigated the blaze, but according to the petitioners the police did not do so.

The only evidence presented relating to the Lithuanian government was their inadequate response with respect

to Reika and the fire. When the visa fraud scheme was first revealed, Reika was detained by the Lithuanian police for two weeks but then released. No charges were filed against Reika. Moreover, as was noted, the petitioners argue that the police failed to investigate the fire at the apartment.

The Immigration Judge (IJ) denied the request for asylum, and the Board of Immigration Appeals (BIA) affirmed in a separate opinion. The IJ held that the harm that the petitioners feared in Lithuania was not on account of a protected ground, and that no competent evidence was presented to support the contention that the government was complicit in the visa fraud or would be supportive of the persons such as Reika that the petitioners feared. The BIA echoed those holdings in its separate opinion. It agreed that the petitioners had failed to provide evidence of government complicity, and noted that a personal dispute cannot support a claim of asylum. Relying on our decision in *Jun Ying Wang v. Gonzales*, 445 F.3d 993, 999 (7th Cir. 2006), the BIA noted that the fear of retribution from co-defendants for an alien's cooperation with the United States government, in exchange for a reduced sentence, is not a well-founded fear based on a protected ground. Accordingly, the BIA held that the petitioners failed to establish a nexus between the feared persecution and a protected ground.

Where the BIA adopts the decision of the IJ and supplements that decision with its own reasoning, we review the IJ's decision as supplemented. *Kaharudin v. Gonzales*,

500 F.3d 619, 622 (7th Cir. 2007). Under the substantial evidence test, we affirm the denial of asylum and of withholding of removal by the IJ and BIA if it is "'supported by reasonable, substantial and probative evidence on the record considered as a whole.'" *Wang*, 445 F.3d at 997, *quoting INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Gjerazi v. Gonzales*, 435 F.3d 800, 807 (7th Cir. 2006).

In order to obtain asylum, the petitioners must establish that they are refugees, which is defined as persons unable or unwilling to return to their country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 USC § 1101(a)(42)(A); *Wang*, 445 F.3d at 997; *Hernandez-Baena v. Gonzales*, 417 F.3d 720, 722-23 (7th Cir. 2005). The first part of that definition may be problematic for the petitioners but we need not tarry long there because the latter part is insurmountable.

The first obstacle that petitioners face is that persecution under that definition does not encompass purely private actions. In order to demonstrate persecution or a well-founded fear of persecution, the petitioners must demonstrate that the threatening conduct is by the government, or that it is by private persons whom the government is unwilling or unable to control. *Tapiero de Orejuela v. Gonzales*, 423 F.3d 666, 672 (7th Cir. 2005); *Galina v. I.N.S.*, 213 F.3d 955, 958 (7th Cir. 2000). The petitioners have presented very little evidence of such government complicity or inability. We have only al-

legations that Reika was not prosecuted by the Lithuanian government for the visa fraud scheme, and that the police did not investigate the fire at the apartment. Missing is any indicator as to why those decisions were made, and whether they constituted a deviation from standard operating procedures. We do not know, for instance, whether the investigation of fires is normally left to the fire department, which did investigate the incident, nor do we know whether the Lithuanian government was presented with sufficient evidence to prosecute Reika but chose not to do so. Nevertheless, even if the allegations here were sufficient to demonstrate persecution, petitioners do not even allege that it is on account of one of the protected grounds.

The petitioners assert in a conclusory manner that they were members of a particular social group, but provide no identification of that alleged group other than to identify themselves as informants whose cooperation was induced by the government through promises of protection. Rather than explain how that constitutes a "social group" under the refugee definition, they argue that the United States government created a dangerous condition by inducing their cooperation, and therefore had an affirmative duty to protect them from that danger.

We have rejected a similar argument in *Wang v. Gonzales*, 445 F.3d 993 (7th Cir. 2006). Jun Ying Wang, a native of China, was present in the United States unlawfully having overstayed her visitor's visa, when she was arrested for her part in a scheme to obtain Social

Security cards using fraudulent documents. *Id.* at 994. Wang cooperated with the government's investigation and in turn received a more lenient sentence. *Id.* She applied for asylum based on her fear that she would be attacked by her codefendants, who were in China and sought retribution for her cooperation against them. *Id.* We rejected the asylum claim, holding that Wang had failed to demonstrate that the persecution she feared was on account of one of the five statutorily-protected grounds. Wang did not explain how her claim fit within one of the protected grounds, choosing instead to argue that the term "refugee" should not be interpreted too rigidly and that she should be eligible because her persecution stemmed from her assistance to the United States government. *Id.* at 997. The petitioners mirror those arguments in their briefs to this court. We rejected that argument in *Wang*, holding that we are bound by the language of the statute, and that fear of persecution as a result of a personal dispute rather than on account of a person's membership in a protected group fails to satisfy the definition of refugee. *Id.* at 998; *Marquez v. I.N.S.*, 105 F.3d 374, 380 (7th Cir. 1997).

A "social group" under the Act is one 'whose members share "common characteristics that members of the group either cannot change, or should not be required to change because such characteristics are fundamental to their individual identities.'" *Ramos v. Holder*, 589 F.3d 426, 428 (7th Cir. 2009), *quoting In re Kasinga*, 21 I. & N. Dec. 357, 366 (BIA 1996); *see also Poroj-Mejia v. Holder*, 397 Fed.Appx. 234, 237, 2010 WL 4102295, 2 (7th Cir. 2010). The

social group, however, cannot be defined merely by the fact of persecution. *See Castillo-Arias v. U.S. Atty. Gen.,* 446 F.3d 1190, 1198 (11th Cir. 2006) ("The risk of persecution alone does not create a particular social group within the meaning of the INA . . .") Nor may a social group be defined solely by the shared characteristic of facing dangers in retaliation for actions they took against alleged persecutors. *Wang v. Gonzales*, 445 F.3d 993, 998 (7th Cir. 2006); *Pavlyk v. Gonzales*, 469 F.3d 1082, 1088-89 (7th Cir. 2006); *Poroj-Mejia*, 397 Fed.Appx. at 237, 2010 WL 4102295 at 2. The petitioners have not attempted to distinguish their claim from those precedents, and in fact have made no argument as to how they constitute a protected group under the Act. They rely instead on their generalized assertion that the government must grant asylum because it placed them in danger by inducing their cooperation in the criminal case. That argument suffers from the glaring problem that they chose to cooperate in return for the benefit of a lesser sentence, and that the choice to place themselves in that danger was theirs not that of the government. More fundamentally, petitioners fail to identify any legal authority for granting asylum on that basis. As we noted in *Wang*, "there are legal alternatives for an alien placed in danger by virtue of her cooperation with the government. . . . [T]he government may seek an 'S-visa' on behalf of an alien cooperating in a criminal investigation." *Wang*, 445 F.3d at 999 n.2, *citing* 8 U.S.C. § 1101(a)(15)(S)(I) and *United States v. Zendeli*, 180 F.3d 879, 881 (7th Cir. 1999). In this case as in *Wang*, the government has chosen not to pursue that option for reasons not clear on the

record. The S-visa, not asylum, is the avenue by which the petitioners could lawfully remain in the United States, but that is not a hand that this court can force. Because the petitioners have failed to demonstrate a well-founded fear of persecution on account of a protected ground for purposes of asylum, they cannot meet the more stringent standards of withholding of removal which require a showing of a clear probability of persecution. *Toure v. Holder*, 624 F.3d 422, 428 (7th Cir. 2010); *Kaharudin v. Gonzales,* 500 F.3d 619, 623 (7th Cir. 2007).

The remaining arguments are similarly unavailing. The petitioners contest the denial of their request for a continuance of the hearing, asserting that it denied them due process because their counsel was not able to adequately develop their case. An immigration court's denial of an alien's request for a continuance is reviewable for abuse of discretion, but the petitioners have failed to demonstrate any abuse of discretion here. *Vahora v. Holder*, 626 F.3d 907, 915, 919 (7th Cir. 2010); *Kucana v. Holder*, 130 S. Ct. 827, 839-40 (2010). To the extent that they are claiming a due process violation, they fail for the additional reason that they have not adequately alleged prejudice from the denial of the continuance. Even before this court, they still have not identified what evidence they hoped to obtain by that continuance. A due process claim cannot succeed absent concrete evidence that the due process violation had the potential to affect the outcome of the hearing. *Ambati v. Reno*, 233 F.3d 1054, 1061 (7th Cir. 2000). Where a petitioner does not "set forth any evidence that would have been presented or arguments that would have been made had his counsel been given

additional time to prepare his case," the petitioner has failed to demonstrate that the alleged violation potentially impacted the outcome of the hearing, and therefore the due process claim must be rejected. *Id.* at 1062; *Kuciemba v. INS*, 92 F.3d 496, 501 (7th Cir.1996.)

Moreover, the petitioners complain of the denial of their motion to remand, but again fail to allege with any specificity what evidence could have been obtained on that remand. The affidavits in support of that motion appear to establish at best that the government of Lithuania is unstable and does little to protect its citizens, but that helps the petitioners only if the actions against them by the private actor—Reika—were on account of one of the five protected grounds. They have failed to even argue that. The potential for private violence based on personal grudges, and the inability of a country to protect its citizens from such unlawfulness, is not a basis for asylum. As we noted, the government could have avoided this result by seeking an "S-visa" on behalf of the petitioners, but it did not do so. The asylum and withholding of removal limitations handcuff our ability to provide any relief here. The decision of the IJ and BIA is AFFIRMED.