## In the

## United States Court of Appeals

### For the Seventh Circuit

No. 12-2734

HAMAD FALHA ALMUTAIRI,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

On Petition for Review from an Order of the
Board of Immigration Appeals.
No. A097 838 024

ARGUED APRIL 30, 2013—DECIDED JULY 12, 2013

Before FLAUM, WOOD, and HAMILTON, *Circuit Judges.*

WOOD, *Circuit Judge.* Hamad Almutairi, a citizen of
Kuwait, is attempting in this case to obtain review of the
denial of his application for asylum and withholding of
removal. We say "attempting" because he encountered
along the way some procedural snarls in connection
with a grant of voluntary departure; these difficulties
caused his case to bounce from the Board of Immigration

Appeals back to the Immigration Judge for further consideration of voluntary departure. At this point, however, that issue is off the table and the case is ready for decision. We conclude that we lack jurisdiction to review the BIA's decision that Almutairi's asylum application is untimely. We can reach the merits of his application for withholding of removal, but we conclude that substantial evidence supports the Board's decision to deny that relief.

**I**

According to his testimony, which the IJ found credible, Almutairi served in the Kuwaiti Air Force in August of 1990, when Iraq invaded and occupied Kuwait. After the Kuwaiti military surrendered, Almutairi remained in the country and joined a resistance group. Iraqi soldiers captured him in September 1990. What followed was a ghastly period of nine days during which he was brutally tortured: his thumb nails were ripped off, he was electrocuted, he was cut with knives and burned with cigarettes, and he was beaten. As if that were not enough, his captors also brought a fellow prisoner into his cell, sodomized that man with a stick, and warned Almutairi that the same would happen to him if he did not tell them where the Kuwaiti resistance was hiding its weapons. Almutairi finally cracked under the pressure and brought the Iraqi soldiers to a house that he thought would be unoccupied. It was not. When the soldiers entered the house, they found and arrested a man who was inside. They then released

Almutairi. Two days later the soldiers publicly executed the man from the house, along with three others.

Almutairi fled the country, but he and his family later returned to their home in Kuwait after the country's liberation. Once back in Kuwait, Almutairi received four threatening phone calls over several months in 1991 and 1992. The caller, who appeared to have a Kuwaiti accent, accused Almutairi of informing on "these four guys" who were executed a year earlier. Around this time, his car tires were slashed while he was parked at a shopping center. He never reported any of these threats to the Kuwaiti government. Almutairi's family eventually encouraged him to leave the country.

Two years after the threats, after spending time in Saudi Arabia, Lebanon, and the United Arab Emirates, Almutairi came to the United States in 1994 on a nonimmigrant student visa. He ended his studies ten years later, apparently taking so long because he feared that upon completing his degree he would be required to return to Kuwait. In 2006 he was served with a Notice to Appear for violating the conditions of his visa. The following year, after his family had received another threatening phone call in Kuwait, he applied for asylum, withholding of removal, and relief under the Convention Against Torture.

At his immigration hearing Almutairi asserted that he feared persecution as a member of a social group consisting of persons who had been forced to assist the Iraqi troops during the invasion of 1990 and who were now perceived by Kuwaitis as being sympathetic to

Iraq. He believed that the threatening caller was a family member of one of the four men who were executed in Kuwait, and that this man had been tracking his movements in Kuwait. Almutairi explained that he did not complain to the Kuwaiti government or apply earlier for asylum in the United States because he feared that if anyone from Kuwait found out what had happened in 1990 he would be targeted and his family's reputation would be destroyed.

The IJ denied Almutairi's requests for relief. The IJ first held that Almutairi was ineligible for asylum because he had not applied within one year of his 1994 entry into the United States, nor had he shown changed country conditions or extraordinary circumstances sufficient to justify his delay. With respect to Almutairi's claim for withholding of removal, the IJ concluded that he had demonstrated past persecution but that the government had rebutted the presumption of future persecution because Iraq no longer occupies Kuwait, and no evidence suggested that the Kuwaiti government would harm him. The IJ also ruled that Almutairi had not demonstrated membership in a cognizable social group. Finally, Almutairi's claim under the Convention Against Torture failed, the IJ reasoned, because he could not show that he would be tortured by Iraqi troops after their expulsion from Kuwait in 1991. The IJ nonetheless granted Almutairi the option of voluntarily departing within 60 days; that option would convert into an order of removal if he chose not to depart voluntarily.

In an opinion issued on June 28, 2012, the Board of Immigration Appeals upheld the IJ's decision. It agreed with the IJ that Almutairi had presented no exceptional circumstances justifying his untimely asylum application. This untimeliness, the Board ruled, also prevented Almutairi from pursuing humanitarian asylum. (A noncitizen who has not established a well-founded fear of future persecution may qualify for humanitarian asylum if he or she "has demonstrated compelling reasons for being unable or unwilling to return to the country [designated for removal] arising out of the severity of the past persecution" or "has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country." 8 C.F.R. § 1208.13(b)(1)(iii).) The Board declined to rule on the cognizability of Almutairi's proposed social group but reasoned that he had not demonstrated a clear probability that he would be persecuted on account of his membership in that group, nor had he shown that the Kuwaiti government would be unwilling or unable to protect him. The Board deemed waived his claim under the Convention Against Torture. Finally, the Board noted that it lacked the power to reinstate Almutairi's period of voluntary departure (which expired long before the Board decided his appeal) because he had not submitted proof of the posting of a bond. But because the IJ had failed to notify Almutairi of the necessity of posting a bond, the Board issued a limited remand "solely for the Immigration Judge to grant a new period of voluntary departure with the requisite advisals."

**II**

On July 25, 2012, Almutairi filed a petition for review from the June 28, 2012, decision of the Board. This prompted a motion from the government asking this court to dismiss the petition for review for "prudential" reasons, without prejudice to re-filing upon the issuance of an administratively final order of removal that completed the adjudication of voluntary departure. (The problem with the IJ's first order was that it did not include all the warnings that must accompany a voluntary departure option; the Board remanded so that the IJ could cure this one flaw, not for purposes of any substantive ground of relief.) In its motion, the government points out that the regulations governing voluntary departure, 8 C.F.R. § 1240.26, require noncitizens to choose *either* voluntary departure *or* a petition for review to a federal court of appeals, because the filing of a petition for review automatically terminates the grant of voluntary departure. See *id.* § 1240.26(i). The government fears that if this court entertains Almutairi's petition for review while the Board's remand to the IJ to grant a new period of voluntary departure is pending, Almutairi could potentially avoid having to make that choice. In other words, the government suggests, he would gain the benefit of a petition for review (and, if successful, the chance to remain in the United States), yet still have the option of voluntary departure upon its reinstatement by the IJ. Full adjudication of the voluntary departure option is necessary, the government concludes, in order to permit (or force) Almutairi to choose between adhering to the terms of the voluntary

departure agreement and seeking judicial review of the Board's order.

Almutairi responds that the Board's decision is final with respect to his claims for asylum and withholding of removal. He notes that the law gives only 30 days for an aggrieved person to file a petition for review. See 8 U.S.C. § 1252(b)(1). His concern, broadly speaking, is that his substantive claims do not get lost in the shuffle between the BIA and the IJ; he fears that the Board's June 28, 2012, decision would be regarded as final for purposes of his substantive claims, noting that the Board's decision concludes as follows:

> For these reasons, we will dismiss [Almutairi's] appeal, and remand the record *solely* for the Immigration Judge to grant a new period of voluntary departure with the requisite advisals.

(Emphasis added.) This limited remand, Almutairi argues, does not give him the right to ask the IJ to consider new claims or evidence on remand, contrary to the representation in the government's motion. Hence, he concludes, his petition for review from the June 28 decision was properly filed and can be adjudicated.

The government replies that Almutairi would not lose his right to obtain judicial review of the Board's decisions on his asylum and withholding claims, because he retains the right to file a timely petition for review from the IJ's new removal order, once it becomes final. Although the INA permits a petition for review only from a final order of removal, see 8 U.S.C. § 1252(a)(1), it defines finality as *either* a determination by the Board

affirming a removal order (still called in that part of the statute an order of deportation) *or* "the expiration of the period in which the alien is permitted to seek review of such order by the Board of Immigration Appeals." 8 U.S.C. § 1101(a)(47)(B). It follows, the government reasons, that it is not strictly necessary for the alien to return to the Board once the voluntary departure issue has been settled. We decided to take this motion with the case.

One final complication has emerged with respect to the propriety of taking up this petition for review now. After further briefing, the government now tells us that on November 27, 2012, the IJ resolved the case with the issuance of an order reinstating the privilege of voluntary departure. The government apparently learned about the order from the agency's toll-free number, which offers a recorded message with updates about particular cases. As a result, the government now withdraws its request that this court dismiss without prejudice. Almutairi has not contested the government's new information in his brief, which was submitted in January 2013. Thus, even though we would prefer a better record on this critical point, we proceed on this basis. Since voluntary departure was ordered on November 27, 2012, Almutairi's 60-day window has expired and now the only remaining avenue for relief is his existing petition for review.

What remains unclear is the moment at which this court's jurisdiction vested: July 25, 2012, when Almutairi filed his petition for review, or January 26, 2013, 60 days after the time for appealing the IJ's final order to the

BIA? This may not make much practical difference for Almutairi, but it is a recurring question in immigration cases, and so we think it worthwhile to address it.

In its motion (which events have overtaken), the government argued that this court should follow the lead of three of our sister circuits and dismiss Almutairi's petition for review without prejudice on the ground that "prudential" considerations favored declining jurisdiction until the IJ adjudicated voluntary departure on remand. See *Li v. Holder*, 666 F.3d 147, 151-54 (4th Cir. 2011) (for prudential reasons, dismissing petition without prejudice); *Giraldo v. Holder*, 654 F.3d 609, 616-18 (6th Cir. 2011) (same); *Hakim v. Holder*, 611 F.3d 73, 79 (1st Cir. 2010) (same). In those three cases, on comparable facts, the government had asserted that there was no final, reviewable decision for the court of appeals because of the Board's remand. In *Li*, the Fourth Circuit held that it had jurisdiction over the Board's order, but that as a matter of prudence it would decline to exercise that jurisdiction until the voluntary departure matter was resolved. The Sixth Circuit did the same thing in *Giraldo*, see 654 F.3d at 612 (citing cases), as did the First Circuit in *Hakim*, see 611 F.3d at 77-79 (assuming "*arguendo*" that the court had jurisdiction and declining to exercise it for prudential reasons).

In our view, because the timely filing of a petition for review has jurisdictional significance, and a petition may be filed only from a final order disposing of a case, we cannot simply assume that jurisdiction exists. Either an order resolving everything except voluntary departure

is final and ripe for a petition for review, or it is not. If it is final, then the alien not only can, but must, file the petition for review within 30 days of the Board's decision. At that point, if either party wants to ask the court of appeals to stay its proceedings pending the ultimate resolution of the voluntary departure request, it is free to do so. *Cf.* FED. R. APP. P. 8(a) (stays in appeals from the district courts). If, on the other hand, the disposition is not final until the issue of voluntary departure is resolved, then the alien should have no obligation to file a petition for review until the IJ has resolved that question, whether in the first instance or on remand from the Board. At that point, a petition for review filed within 30 days of either the Board's final order (if the alien files a new petition for review with the Board) or of the expiration of time to seek review would be enough to bring up all issues and interlocutory rulings. Compare *Kunik v. Racine Cnty.*, 106 F.3d 168, 172 (7th Cir. 1997) (appeal from final judgment brings up all interlocutory orders that preceded it).

The choice between these two possibilities is a difficult one. It depends in part on how one should understand an order permitting voluntary departure: as a form of substantive relief for the alien, or as a discretionary administrative ruling that does not affect the alien's substantive rights. Perhaps the strongest point in favor of the former reading is the fact that substantive rights do accompany an order of voluntary departure. Not only does the alien gain the option of departing to any destination of her choice, with some control over the time of departure, but she also avoids an order of

removal and the bars to readmission to the United States that would apply if she were instead removed by the government. See, *e.g., Dada v. Mukasey,* 554 U.S. 1, 11-12 (2008); *Azarte v. Ashcroft,* 394 F.3d 1278, 1284 (9th Cir. 2005); see also 8 U.S.C. § 1182(a)(9)(A) (discussing rules for admission of aliens previously removed). Aliens who are granted voluntary departure but fail to leave within the permitted time "generally bec[o]me ineligible for the immigration benefits of voluntary departure, suspension of deportation, adjustment of status, change of non-immigrant classification, and registry, for a period of five years following the scheduled departure date or the date of illegal reentry, if any." David S. Rubenstein, *Restoring the Quid Pro Quo of Voluntary Departure,* 44 Harv. J. on Legis. 1, 11 (2007). On the other hand, the decision whether to grant voluntary departure lies in the discretion of the Attorney General or the Secretary of Homeland Security and is not reviewable in the court of appeals. See 8 U.S.C. § 1229c(f); see also *Bachynskyy v. Holder,* 668 F.3d 412, 416 (7th Cir. 2011). Without any possibility of judicial review, voluntary departure looks like an internal decision for the immigration authorities that at most has collateral consequences for the alien. If the latter is true, then the BIA's or the IJ's failure to issue a final decision on voluntary departure might not be enough to defeat the finality that is needed to support a petition for review.

The immigration statutes do not shed much light on the question which of these two alternatives is correct, but they may help a little. In ordinary civil litigation, a case is not final until the district court has disposed

not only of all theories of recovery, but also of all theories of relief. See FED. R. CIV. P. 54(b). Yet that rule may not carry over to the immigration context. The INA defines an order of deportation as "the order of the [authorized official] concluding that the alien is deportable or ordering deportation." 8 U.S.C. § 1101(a)(47)(A). Substituting current terminology, we see that the "final" order might do no more than establish that the alien is removable; it need not go further and order immediate removal. The fact that the availability of voluntary departure may be up in the air has no effect at all on the removability of the alien—it affects only the manner of her exit.

Our sister circuits have all found that an order from the BIA resolving everything except an issue relating to voluntary departure satisfies the finality rules of the INA, 8 U.S.C. § 1252(a)(1). See *Li, supra* (4th Circuit); *Giraldo, supra* (6th Circuit); *Hakim, supra* (1st Circuit). We are not inclined to create a circuit split on that point, given how close the question is. We thus align ourselves with our colleagues on the finality point: Almutairi's petition for review was therefore filed at the appropriate time when he submitted it within 30 days of the Board's June 28, 2012, decision. We are less comfortable, however, with the notion that a court ought to dismiss a properly filed petition without prejudice and invite a later filing after the voluntary departure terms are sorted out. Why would such a filing be timely? Can we be sure that the government would not argue that the alien waived the right to judicial review by not filing her petition after the merits ruling? In our view, the proper approach is for the alien to file her petition for review

within 30 days of a Board order resolving everything except voluntary departure, and then for this court to retain jurisdiction but to stay proceedings on the petition until voluntary departure has been resolved one way or the other. That way, there is no chance that the alien will be deprived of her right to obtain review of the Board's decision, and at the same time the risk that the government would like to avoid (allowing the alien to obtain full judicial review while at the same time enjoying the benefits of voluntary departure) will be avoided. As a practical matter, that is exactly what happened in Almutairi's case: he filed his petition for review; the case remained on this court's docket but no action was taken on it; and the IJ then finished his work on the voluntary departure question. Thus the case is ready for disposition, and we can turn to the merits.

## III

Almutairi first argues that the Board erred by affirming the IJ's finding that his asylum claim was untimely. He contends that the IJ's ruling of untimeliness is internally inconsistent because the IJ acknowledged his past persecution. This acknowledgement, Almutairi urges, constitutes a finding of asylum eligibility and is therefore incompatible with the IJ's determination that his asylum application was untimely. But the IJ's discussion of past persecution is perfectly consistent with a determination that Almutairi's asylum application was untimely. Past persecution is not relevant only to asylum; it is also pertinent to withholding of removal, which does not

have a statutory limitations period. See 8 C.F.R. § 1208.4(a). In any case, we lack jurisdiction to review the Board's determination that Almutairi failed to meet any of the exceptions to the rules governing the time within which an asylum application must be filed, because that conclusion did not turn on any question of law or constitutional claim. See 8 U.S.C. § 1158(a)(2)(D), (a)(3); *Abraham v. Holder*, 647 F.3d 626, 632 (7th Cir. 2011); *Viracacha v. Mukasey*, 518 F.3d 511, 514-16 (7th Cir. 2008). And although Almutairi argues that he deserves humanitarian asylum, this relief is barred by the same limitations period. See 8 C.F.R. § 1208.13(b)(1)(iii), (c). Accordingly, we must dismiss Almutairi's petition to review the Board's decision that his asylum application is untimely for want of jurisdiction.

Almutairi next contests the Board's denial of withholding of removal, a matter over which this court *does* have jurisdiction. To qualify for withholding of removal based on his membership in a particular social group, Almutairi had to demonstrate a clear probability that, if removed, his life or freedom would be threatened on account of his membership in the group. See 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 1208.16(b); *Liu v. Holder*, 692 F.3d 848, 852 (7th Cir. 2012). The threat must be attributable either to the government or to a nongovernmental entity that the government is unable or unwilling to control. *Jonaitiene v. Holder*, 660 F.3d 267, 270-71 (7th Cir. 2011); *Tapiero de Orejuela v. Gonzales*, 423 F.3d 666, 672 (7th Cir. 2005). We review the Board's evaluation of these issues deferentially. *Liu*, 692 F.3d at 852.

Almutairi argues at length that the four threatening phone calls he received over 20 years ago from an unidentified caller qualify as persecution, and he also challenges the IJ's determination that he failed to establish a cognizable social group. Even if he is correct on those points, however, he cannot succeed. That is because Almutairi does not seriously challenge one of the main bases for the Board's rejection of his withholding petition: his failure to show that he would now be persecuted by the Kuwaiti government or by a group that the government was unable or unwilling to control. See *Jonaitiene*, 660 F.3d at 270-71 (explaining that, for purposes of refugee status, persecution "does not encompass purely private actions"). Almutairi gave the IJ no reason to attribute the calls to the Kuwaiti government, and because he never mentioned the threatening calls to anyone in the Kuwaiti police or military, he could only speculate that the Kuwaiti government might not protect him if he did seek its help. Because he does not even address this issue on appeal, he has fallen far short of showing that the evidence compels a different result. See *Liu*, 692 F.3d at 852. Under the circumstances, despite the horrific treatment that Almutairi endured, the Board's conclusion that he is not entitled to withholding of removal cannot be disturbed.

Almutairi's petition for review is DISMISSED for want of jurisdiction with respect to his claim for asylum and DENIED with respect to his request for withholding of removal.