In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-2179

MOHAMED BOURAS,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR.,
Attorney General of the United States,

*Respondent*.

On Petition for Review of an Order of
the Board of Immigration Appeals
No. A089 601 787

ARGUED JANUARY 27, 2015 — DECIDED MARCH 4, 2015

Before POSNER, SYKES, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Petitioner Mohamed Bouras, a citizen of Algeria, was granted status as a conditional permanent resident based on his marriage to a U.S. citizen. That marriage ended by divorce before Bouras had obtained unconditional permanent residency. He was later placed in removal proceedings after he failed to convince the United

States Citizenship and Immigration Services that he had entered the marriage in good faith.

In immigration court, Bouras sought a discretionary waiver available to aliens who can show that they entered in good faith a failed marriage with a U.S. citizen. Bouras testified at the final removal hearing, but neither his ex-wife nor any other witness appeared at the hearing to testify about the marriage. At the end of the hearing, Bouras sought a continuance so that his ex-wife could testify as well. The immigration judge denied that request, saying that no "extenuating circumstances" justified a continuance. The judge then found that Bouras was not eligible for the discretionary waiver because he had not established the marriage had been in good faith. The Board of Immigration Appeals upheld that decision, including the denial of a continuance. The Board endorsed the judge's explanation and added its own reasons for concluding that Bouras's request for a continuance was properly denied. Bouras has petitioned for review. He does not challenge the judge's and the Board's finding that he failed to prove his case. He argues only that he should have been granted a continuance so that his ex-wife could testify on his behalf. We deny the petition. The denial of Bouras's last-minute request for a continuance was not an abuse of discretion.

I.  *Factual and Procedural Background*

Bouras entered the United States in 1997 as a nonimmigrant visitor for business. See 8 U.S.C. § 1101(a)(15)(B); 22 C.F.R. § 41.31(a). He overstayed his visa and thus was, like so many others, living in this country illegally. In September 2006, while Bouras was living in Chicago, he married Jennifer Schreiner, a U.S. citizen who lived in Ohio. A year

after marrying he became a conditional permanent resident based on that marriage. See 8 U.S.C. § 1186a(a)(1); 8 C.F.R. §216.1.

To gain unconditional status, a conditional permanent resident must establish that he or she entered into the marriage in good faith. This showing is made most often by filing a joint petition with the citizen spouse and appearing with the spouse for a personal interview. 8 U.S.C. § 1186a(c), (d); 8 C.F.R. § 216.4(a)(1), (b). The necessary "Petition to Remove Conditions on Residence" (also called a Form I-751) can be filed only within the 90-day period before the second anniversary of obtaining conditional permanent residency. 8 U.S.C. § 1186a(d)(2); 8 C.F.R. § 216.4(a)(1).

If the marriage ends before the alien has satisfied these requirements, the alien can still obtain unconditional status by filing the Form I-751 without the spouse and requesting a discretionary waiver. To receive the discretionary waiver—and with it, the removal of the conditions on residence—the alien must demonstrate that the marriage was entered in good faith even though it later failed. 8 U.S.C. § 1186a(c)(4)(B); 8 C.F.R. § 216.5(a)(1)(ii).

In early 2009, Bouras and Schreiner divorced. For most of their two-and-a-half year marriage, Bouras had continued working in Chicago while Schreiner remained in Ohio. For at least six months of their marriage, Bouras had returned to Algeria alone to visit his family. After the divorce, Bouras submitted a Form I-751 to United States Citizenship and Immigration Services requesting a discretionary waiver of the joint-filing requirement. As evidence that his marriage to Schreiner was in good faith, Bouras submitted an affidavit from Schreiner, as well as letters and affidavits from several

friends and family members, utility bills, photographs of him with Schreiner, copies of unsigned joint income tax returns saying that Bouras had been unemployed and earned nothing during their marriage, an e-mail from Southwest Airlines confirming Schreiner's purchase of a ticket from Ohio to Chicago in December 2006, Bouras's Ohio driver's license and car title, an undated letter showing that Schreiner had opened a joint checking account with Fifth Third Bank, and two bank statements from Fifth Third showing minimal activity in that account.

In her brief affidavit, Schreiner said that she had lived in Columbus during the marriage while Bouras lived in Chicago. She explained that he did so only because he could not find a job in Ohio, and that every month he took a couple of weeks off from his job driving a cab in Chicago to live with her in Columbus. Schreiner said that she and Bouras had divorced because he wanted children and she did not (she had two young children from a previous marriage). She said that she had changed the electric service for her home into Bouras's name to make him feel like he "belong[ed] in [their] home" and that they had a joint checking account with Fifth Third Bank that "was not utilized often." Schreiner also said there were not many pictures of the couple because usually one of them was taking the pictures, mostly of her children. In the other affidavits and letters submitted by Bouras, family and friends described interactions with the couple.

In early 2010, USCIS denied Bouras's request for a waiver, finding that he had failed to show by a preponderance of the evidence that he and Schreiner married in good faith. The agency noted, among other things, that the couple had

not lived together during the marriage. (Everyone recognizes that married couples may sometimes need to live apart for a host of reasons. See, e.g., *Surganova v. Holder*, 612 F.3d 901, 905 (7th Cir. 2010). Still, an undocumented alien's brief marriage to a U.S. citizen, during which the couple spent little or no time together and kept their property and finances separate, raises obvious warning signs for immigration authorities. See 8 C.F.R. § 1216.5(e)(2) (stating that evidence relevant to "whether an alien entered into a qualifying marriage in good faith … may include … [d]ocumentation relating to the degree to which the financial assets and liabilities of the parties were combined" and "[d]ocumentation concerning the length of time during which the parties cohabited after the marriage and after the alien obtained permanent residence").) Bouras's status as a conditional permanent resident was terminated, and the agency issued a Notice to Appear charging him with removability. See 8 U.S.C. § 1227(a)(1)(D)(i).

At a February 2011 appearance before the immigration judge, Bouras conceded removability but renewed his request for a discretionary waiver of the joint filing requirement. A year later, in February 2012, the immigration judge scheduled the final removal hearing for August 2012. Notice of that hearing was sent to Bouras's lawyer. About three weeks before the hearing date, Bouras tendered as evidence essentially the same materials he had tendered in support of his Form I-751. He also submitted a witness list naming both himself and his ex-wife, Schreiner.

At the beginning of the final removal hearing, Bouras's lawyer announced that Schreiner had sent him a fax earlier in the week saying she would be unable to attend. In the fax,

dated five days before the hearing, Schreiner said that she had been "just notified" of the hearing date and was unable to take time off work for the next six to eight weeks because she was needed to train a new hire. Bouras's lawyer did not request a continuance at that time but went forward with the hearing, calling Bouras to testify.

Bouras testified that he first met Schreiner while visiting Columbus, Ohio, in 2005 and married her a year later. He had worked as a cab driver in Chicago during the marriage, Bouras said, because he needed the money and his efforts to find work in Columbus (by running a hotdog stand and obtaining a chauffeur's license) were unsuccessful. According to Bouras, he routinely worked in Chicago for two or three weeks and then joined Schreiner in Columbus for two weeks. During the marriage, he also had spent a total of six months visiting Algeria, though never with Schreiner. Bouras testified that he and Schreiner split up because he wanted children but she did not.

When asked about the joint tax returns he had submitted, Bouras said that Schreiner sent them to use as evidence in the removal proceedings but that he had never seen them before. He acknowledged that his income was not reported on the returns. He said that he and Schreiner did not jointly own any property, but said he had contributed half of the mortgage payments on Schreiner's house during the marriage. When asked about the couple's seldom-used joint checking account, Bouras said he did not have records showing how often the account had been used. He said that he had withdrawn money from the account to buy equipment for his hotdog stand but no longer had records of those purchases.

After Bouras finished his testimony, his counsel for the first time requested a continuance so that Schreiner could testify. The immigration judge denied the request, explaining that he does not "continue the cases once they're scheduled for a final hearing unless there's an emergency situation" or "unless there's some extenuating circumstance."

The judge then gave his oral decision denying Bouras's petition for a discretionary waiver and ordering him removed to Algeria. The judge found not credible Bouras's testimony that he lived apart from Schreiner because he could not find work in Columbus. Because no witnesses were available for cross-examination, the judge gave little weight to the affidavits that Bouras had submitted. The affidavits were further undermined, the judge reasoned, by the facts that the couple did not have joint assets and that Bouras was unfamiliar with his own purported tax returns. Finally, the judge noted that Bouras had made several long trips to Algeria during the brief marriage, always without Schreiner. The judge did not find that the marriage was a sham, but he found that Bouras had failed to meet his burden of proving that he entered into the marriage in good faith.[1]

---

[1] There was no inherent inconsistency in the immigration judge's finding that Bouras had failed to meet his burden of proof without making an affirmative finding of a fraudulent marriage. To obtain the discretionary waiver, Bouras had the burden of proving good faith. 8 U.S.C. § 1186a(c)(4)(B); 8 C.F.R. § 216.5(a)(1)(ii). The government has not taken the further step of trying to prove by clear and convincing evidence that the marriage was in fact fraudulent. See 8 U.S.C. §§ 1227(a)(1)(A), 1182(a)(6)(C)(i); *Surganova v. Holder*, 612 F.3d 901, 904 (7th Cir. 2010). Such a finding could result in Bouras being barred for life from attaining immigration benefits through a citizen spouse or other relative. See 8 U.S.C. § 1154(c); *Ogbolumani v. Napolitano*, 557 F.3d 729 (7th Cir. 2009)

The Board upheld the immigration judge's denials of the discretionary waiver and the request for a continuance. The Board agreed with the judge that Bouras had failed to prove by a preponderance of the evidence that his marriage to Schreiner was in good faith. The Board also concluded that the judge had correctly denied Bouras's request for a continuance because, the Board explained, Bouras had not demonstrated good cause as required by regulation. See 8 C.F.R. § 1003.29. The judge's refusal to grant a continuance was justified, the Board reasoned, because Bouras (1) had waited until the day of the final hearing to request the continuance, (2) had not "explained why his ex-wife was apparently not provided notice until a few days before the hearing," and (3) had not clarified whether his ex-wife "could provide testimony by phone or in-person on a date that would not conflict with her work schedule."

II. *Analysis*

Bouras's petition for review does not challenge the immigration judge's conclusion, affirmed by the Board, that he failed to meet his burden of proving that he married

---

(affirming denial of visa to alien based on good-faith second marriage where government found that his first marriage had been fraudulent). Nor, quite sensibly, has the government tried to take the still further step of criminal prosecution, which is also possible. See 8 U.S.C. § 1325(c); *United States v. Darif*, 446 F.3d 701 (7th Cir. 2006). We recognize that Bouras has offered evidence of a good-faith marriage that could have supported a discretionary finding in his favor. There is no evidence that he paid Schreiner to marry him, which is the typical hallmark of a sham marriage. Since the immigration system is certainly overburdened, it's no surprise in this close case that the government has not tried to meet these higher burdens to impose punitive sanctions on Bouras in addition to his removal.

Schreiner in good faith. Nor does Bouras challenge on any other ground the denial of his application for the discretionary good-faith marriage waiver. Most challenges to the denial of such a waiver would be foreclosed by 8 U.S.C. § 1252(a)(2)(B)(ii), which restricts our review of decisions of the Attorney General or the Secretary of Homeland Security that are made discretionary by statute. See 8 U.S.C. § 1186a(c)(4) (providing that grant of good-faith marriage waiver is within discretion of Secretary of Homeland Security); *Boadi v. Holder*, 706 F.3d 854, 857 (7th Cir. 2013); *Fynn v. U.S. Attorney General*, 752 F.3d 1250, 1252 (11th Cir. 2014); *Johns v. Holder*, 678 F.3d 404, 405–06 (6th Cir. 2012). Although 8 U.S.C. § 1252(a)(2)(D) could provide jurisdiction to review colorable legal and constitutional claims, Bouras has not raised any such claims.

The only decision that Bouras challenges in this court is the denial of his request for a continuance. We have jurisdiction to review that denial. Although we lack jurisdiction to review the discretionary denial of the good-faith marriage waiver, review of a related procedural motion (such as a motion for a continuance) is foreclosed "only if the agency's rationale for denying the procedural request also establishes the petitioner's inability to prevail on the merits of his underlying claim." *Calma v. Holder*, 663 F.3d 868, 876 (7th Cir. 2011); see *Zambrano-Reyes v. Holder*, 725 F.3d 744, 749 & n.2 (7th Cir. 2013); *Moral-Salazar v. Holder*, 708 F.3d 957, 960 (7th Cir. 2013); *Cruz-Mayaho v. Holder*, 698 F.3d 574, 576–77 (7th Cir. 2012). Here, the agency's rationale for denying Bouras's motion for a continuance—that he failed to establish good cause—does not affect whether he is entitled to or eligible for the discretionary waiver, so we have jurisdiction over his petition.

The scope of our review, however, is narrow. We review the denial of a motion for a continuance only for an abuse of discretion. See *Calma*, 663 F.3d at 878; *Jonaitiene v. Holder*, 660 F.3d 267, 272 (7th Cir. 2011). Under this standard, we will uphold the denial of a continuance "unless it was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group." *Calma*, 663 F.3d at 878 (citations and internal quotation marks omitted). When, as here, the Board agrees with the immigration judge and supplements the judge's decision with its own explanation, we review the judge's decision as supplemented by the Board's reasoning. See *Barma v. Holder*, 640 F.3d 749, 751 (7th Cir. 2011); *Pawlowska v. Holder*, 623 F.3d 1138, 1141 (7th Cir. 2010).

By regulation, a party seeking a continuance must show "good cause." 8 C.F.R. § 1003.29; *Mozdzen v. Holder*, 622 F.3d 680, 684 (7th Cir. 2010). "Good cause" is not defined by the regulations, so the standard is interpreted by the Board "in different ways depending on the facts and circumstances presented." *Matter of Hashmi*, 24 I. & N. Dec. 785, 788 (BIA 2009). When a continuance is sought for the purpose of presenting additional evidence, the standard for granting the request is high. *Id.* At a minimum, the party must show that significantly favorable evidence is not currently available despite a good-faith effort to present it. See *Adame v. Holder*, 762 F.3d 667, 672–73 (7th Cir. 2014); *Hashmi*, 24 I. & N. Dec. at 788; *Matter of Sibrun*, 18 I. & N. Dec. 354, 356–57 (BIA 1983).

Bouras's principal contention is that the immigration judge improperly denied the continuance based on "case

completion goals." He asserts that the judge's "statements show that as a rule he will not consider continuance requests when the case is set for trial in the absence of an emergency." The continuance was denied, Bouras insists, not because he lacked good cause but solely "because the case was set for trial already."

We find no abuse of discretion. First, the record refutes Bouras's assertion that the immigration judge applied an improper legal standard. The judge said that once a final hearing is scheduled, he grants continuances only when there is "an emergency situation" or "some extenuating circumstance." We see no significant gap between that approach and the regulation's good cause requirement applied by the Board and by this court. See *Adame*, 762 F.3d at 673 (petitioner seeking continuance must show, among other things, that he was "unable to procure the necessary evidence despite a diligent effort"); *Sibrun*, 18 I. & N. Dec. at 356 (petitioner seeking continuance "at least must make a reasonable showing that the lack of preparation occurred despite a diligent good faith effort to be ready to proceed").

As the party seeking a continuance, Bouras bore the burden of showing good cause. See 8 C.F.R. § 1003.29; *Mazariegos-Paiz v. Holder*, 734 F.3d 57, 66 (1st Cir. 2013); *Ramchandani v. Gonzales*, 434 F.3d 337, 338 (5th Cir. 2005). To show that denying a continuance was an abuse of discretion, Bouras must show at the very least that Schreiner's testimony would have been significantly favorable to him and that he made a good-faith effort to obtain her appearance. He has not shown either point.

First, Bouras never established that Schreiner's testimony would have been significantly favorable to him. The only ev-

idence we have of what she would have said is her affidavit. That affidavit does not undermine the judge's findings that the couple had no joint assets, that their purported tax returns were suspect, and that Bouras had spent most of the marriage apart from Schreiner either in Chicago or Algeria. Bouras asserts that Schreiner "could have answered questions about the tax returns." But Schreiner's statement in her affidavit that Bouras had worked as a cab driver in Chicago directly contradicts the joint tax returns in which she reported that he was unemployed. Bouras does not tell us how Schreiner could explain this discrepancy. His challenge to the judge's denial of the continuance fails because he has not shown that he was prejudiced by the decision. See *Wang v. Holder*, 759 F.3d 670, 675 (7th Cir. 2014); *Calma*, 663 F.3d at 878.

Second, even if we assume that Schreiner's testimony would have been helpful, Bouras has not shown that he made a good-faith effort to ensure her presence. As the Board pointed out, Bouras has yet to explain why he blindsided the judge by waiting until the day of the hearing—indeed, until the end of the hearing—to request a continuance when he knew five days before the hearing that his ex-wife would not be available. That failure distinguishes this case from those in which we have concluded that an immigration judge erred by denying a continuance to a petitioner seeking to submit additional evidence. See, e.g., *Gjeci v. Gonzales*, 451 F.3d 416, 419–24 (7th Cir. 2006) (concluding that judge should have granted continuance to pro se petitioner when his lawyer unexpectedly withdrew shortly before merits hearing and kept documents critical to the case); *Boyanivskyy v. Gonzales*, 450 F.3d 286, 291–94 (7th Cir. 2006) (granting petition for review where—despite petitioner's

best efforts to make witnesses available—judge arbitrarily scheduled merits hearing for date when judge knew none of the witnesses could testify).

As the Board noted, Schreiner said in her fax that she had just been told about the date of a hearing scheduled six months earlier. That statement undermined any claim that Bouras diligently sought her testimony. Bouras suggests Schneider's phrase "just notified" is cryptic. It's not precise, but it's not consistent with a diligent effort by Bouras to make sure that she could attend the hearing. Bouras has not claimed that he had told her about the removal hearing long enough before she sent the fax for her to have planned to attend.

Bouras responds that it would not have mattered how far in advance Schreiner learned of the hearing date because she would have been unavailable due to the staffing shortage. The assertion does not persuade us that the denial was an abuse of discretion. Whether Schreiner might have been able to appear, either in person or otherwise, is a question of fact. Schreiner did not say, and has never said, that even with sufficient advance notice she would not have been able to adjust her work schedule to accommodate Bouras's need for her testimony. And as the Board pointed out, witnesses in immigration proceedings may testify by telephone. See 8 U.S.C. § 1229a(b)(2); 8 C.F.R. § 1003.25(c). If Schreiner had been notified earlier—or if Bouras had requested accommodations before the hearing—perhaps arrangements could have been made for her to testify by telephone before or after work or during a break.[2] And while perhaps another immigration

_____

[2] Although Bouras may have been unaware that witnesses could testify telephonically, the record shows that his lawyer was familiar with

judge might have suggested that option, even at the end of the hearing, we see no basis for finding that it was an abuse of discretion for the judge not to make the suggestion himself.

Finally, Bouras argues that all of these reasons for denying his motion for a continuance are irrelevant because they were articulated by the Board rather than the immigration judge. As noted, however, the Board's reasons are properly considered where, as here, the Board agrees with the judge's decision and provides its own supplementary reasoning. See *Barma*, 640 F.3d at 751; *Pawlowska*, 623 F.3d at 1141.

Accordingly, Bouras's petition for review is DENIED.

---

this option. Prior to the Master Calendar Hearing in February 2011, he filed an "Emergency Motion to Appear Telephonically." That motion was granted by the immigration judge and counsel appeared at the hearing via telephone.

POSNER, *Circuit Judge*, dissenting. The immigration judge, the Board of Immigration Appeals, and my colleagues on this panel have confused a failed marriage with a fraudulent one. The majority opinion declares that "the [immigration] judge did not find that the marriage was a sham, but he found that Bouras had failed to meet his burden of proving that he entered into the marriage in good faith." But if the marriage wasn't a sham, it must have been in good faith. For what would a bad-faith marriage that was not a sham be? The Board and my colleagues have also ratified a procedural error by the immigration judge that seriously prejudiced the immigrant.

An immigrant otherwise unauthorized to remain in the United States has a path to citizenship by marrying an American citizen, provided that the marriage is not fraudulent—that is, that at the time of the marriage the parties had intended to establish a life together and were not simply marrying for the purpose of obtaining U.S. citizenship for the immigrant. Often in such a case the U.S. citizen spouse is paid. But there is no suggestion of that here; nor is it a remotely plausible possibility given the financial situation of the immigrant spouse.

Often, it is true, the motive for entering a fraudulent marriage is selfless. A famous example, though involving British rather than U.S. citizenship, is W. H. Auden's 1935 marriage to Erika Mann, the eldest daughter of Thomas Mann. The sole purpose of the marriage was to enable her to leave Nazi Germany and become a British citizen. Both husband and wife were homosexual and never lived together. The marriage was for a good cause but nevertheless was fraudulent. It was never dissolved, because neither party

could have entered into a same-sex marriage. Neither party was punished for the fraud. They were lucky to marry in England and not in the United States, if one may judge from the attitude displayed by the authorities in this case.

Bouras, who is Algerian, was working as a taxicab driver in Chicago in 2005 (he had entered the country on a visitor's visa in 1997, and so had no right to still be here) when, on a visit to a friend in Columbus, Ohio, he met a divorced woman named Jennifer Schreiner. She lived near Columbus and worked as an account manager at CompManagement, Inc., and later as a lost-time claims examiner for Frank Gates Service Company. Both are Columbus firms that are in the business of administering workers' compensation insurance contracts. The two married in September 2006. She was 31 years old, he 36.

There is no evidence that the marriage was fraudulent. Jennifer's job in Columbus paid more than Bouras's job as a taxicab driver in Chicago, and she owned her home (Bouras at the time shared a rented apartment with another man), and had two young children. Given her job and her family situation, there was no question of her moving to Chicago. So instead Bouras tried to find work in Columbus. He entered a lottery to obtain a license to operate a hotdog stand there, and obtained a license, but it turned out to be in a bad location. He tried to make a go of it but was unable to do so and after several months gave up and returned to his taxicab job in Chicago. While in Columbus he lived with his wife, and after returning to Chicago after the failure of his hotdog venture would return to Columbus every month or so and live with her in her house for two weeks or so.

The majority opinion states that "as evidence that his marriage to Schreiner was in good faith, Bouras submitted an affidavit from Schreiner, as well as letters and affidavits from several friends and family members, utility bills, photographs of him with Schreiner, copies of unsigned joint income tax returns saying that Bouras had been unemployed and earned nothing during their marriage, an e-mail from Southwest Airlines confirming Schreiner's purchase of a ticket from Ohio to Chicago in December 2006, Bouras's Ohio driver's license and car title, an undated letter showing that Schreiner had opened a joint checking account with Fifth Third Bank, and two bank statements from Fifth Third showing minimal activity in that account."

Schreiner submitted an affidavit in the administrative proceeding, which the majority opinion summarizes as follows: "Schreiner said that she had lived in Columbus during the marriage while Bouras lived in Chicago. She explained that he did so only because he could not find a job in Ohio, and that every month he took a couple of weeks off from his job driving a cab in Chicago to live with her in Columbus. Schreiner said that she and Bouras had divorced because he wanted children and she did not (she had two young children from a previous marriage). She said that she had changed the electric service for her home into Bouras's name to make him feel like he 'belong[ed] in [their] home' and that they had a joint checking account with Fifth Third Bank that 'was not utilized often.' Schreiner also said there were not many pictures of the couple because usually one of them was taking the pictures, mostly of her children." The only fishy element in this account is, as the majority opinion points out, that "Schreiner's statement in her affidavit that Bouras had worked as a cab driver in Chicago directly con-

tradicts the joint tax returns in which she reported that he was unemployed." But there isn't any doubt that Bouras worked as a cab driver in Chicago.

The couple separated in August 2008, apparently because Bouras wanted to have children, while Jennifer, having two children from her previous marriage living with her, did not. They also had quarreled over her dog. The following year they divorced.

I wouldn't expect a marriage between an Algerian immigrant who drives a cab in Chicago and an American woman (Jennifer's maiden name is "Jones" and photographs of her, her children, and her sister—who submitted an affidavit on Bouras's behalf—make plain that they are of northern European, not north African, ethnicity) who has a corporate job in another state to have the brightest prospects for success. And though commuting marriages have become fairly common, such a marriage can place a great strain on a relationship. The combination of a marriage between persons in different socio-economic classes and of different nationalities with the fact that one has children by a previous marriage and the other does not and that it's a commuting marriage doesn't augur well for marital stability. Ten percent of second marriages (marriage to Bouras was Jennifer's second marriage) end within one year. Avvo, "Marriage and Divorce," www.avvo.com/legal-guides/ugc/marriage-divorce-statistics (visited Mar. 1, 2015, as were the other websites cited in my opinion). Bouras's marriage to Jennifer endured (treating their separation as its termination) for 23 months.

In deciding to deport Bouras the immigration judge and the Board of Immigration Appeals made some downright silly remarks, noting for example that Bouras had failed to

explain why Jennifer had not moved with him to Chicago. She had young children, other family, a house that she owned, and a good job in Ohio, and there is no information on what her prospects for obtaining a job in Chicago comparable to her Columbus job would have been. Also the cost of living is lower in Columbus than in Chicago. NUMBEO, "Cost of Living Comparison between Chicago, IL and Columbus, OH," www.numbeo.com/cost-of-living/compare_cities.jsp?country1=United+States&city1=Chicago%2C+IL&country2=United+States&city2=Columbus%2C+OH.  Another silly remark was that the couple had not "commingled" its assets. Not all married couples do—and it is doubtful that Bouras has ever had any significant assets.

The immigration judge couldn't understand why, Bouras's hotdog stand having fallen through, he had not waited the required amount of time and then started driving a cab in Columbus. He had obtained an Ohio driver's license on February 16, 2007, so the six-month waiting period before he could use it as a taxicab driver would have ended in August of that year. His hotdog stand failed in June and on July 17, 2007, he re-applied for an Illinois driver's license and was therefore required to and did surrender his Ohio license (one is allowed to have only one state's driver's license at a time, so to obtain the Ohio license he had to give up his Illinois one). Once he decided to go back to Chicago to make some money driving a cab in July 2007 he could not return and try to obtain an Ohio commercial driver's license as well. The fact that he obtained a license to open a hotdog stand in Ohio and operated it, and obtained an Ohio driver's license as well, is evidence that he intended to live with his wife. So far as appears, he returned to Illinois only because his employment prospects in Ohio turned out to be poor. We have

no information on openings or income in cab driving in Columbus in 2007.

The immigration judge was troubled by the fact that during the marriage Bouras made several long trips to Algeria, to visit his family there, and didn't take Jennifer with him. (He was able to leave and return to the United States because he had become a conditional permanent resident on the basis of his marriage.) But there is no evidence that she could have spared the time either from her job, or from her still-young children, to take such trips. As for where Bouras got the money for the plane tickets, it might have been from his wife, from his Algerian family, or even out of his own pocket, because even today one can buy a round-trip ticket between Chicago and Algiers for less than $800. The price may have been lower when he made the trips during their marriage, which ended some years ago. Anyway how the trips were financed was not considered by the immigration judge or the Board of Immigration Appeals.

There is no evidence that Jennifer had a financial motive in marrying Bouras or that she ever obtained any money from him (her income was higher than his, but she had child and household expenses that he didn't), and so a financial motive for her agreeing to marry him (and thus smooth his way to eventual U.S. citizenship) can be excluded. There is also no evidence of a selfless motive for a phony marriage, as in the Auden-Mann marriage. Does an apparently successful middle-class Midwesterner marry an illegal Algerian immigrant who drives a taxi in another (and non-adjoining) state because she feels sorry for him for not being a U.S. citizen? Not likely—and there's no evidence of such an Audenesque

motive. I cannot locate the factual basis for supposing the marriage to have been fraudulent.

In all likelihood what did in Bouras was the immigration judge's refusal to grant a continuance to enable Jennifer to testify at Bouras's hearing. When the hearing began, his lawyer told the immigration judge that Jennifer couldn't appear because of a severe staffing shortage in her office in Columbus that would keep her tied up there for six to eight weeks. It's not as if Chicago and Columbus were next door, so that she could have taken a few hours off work to attend the hearing. The two cities are 356 miles apart by road, and it takes six hours to drive from one to the other. Flying is faster of course, but given the frequent delays in current American air travel plus the added travel time from origin to airport at one end of the trip and from airport to destination at the other end, overall travel time is unlikely to be significantly shorter by air than by road.

Bouras's lawyer had received a fax from Jennifer five days before the hearing, informing him that she could not attend it on the scheduled date. He should have notified the immigration judge promptly, but failed to do so. But that delay was not a factor in the immigration judge's refusal to grant a continuance, concerning which he said only:

> I don't continue cases once they're scheduled for a final hearing unless there's an emergency situation. If the respondent's wife could not come to court because of her work, then she's not able to come to court. That's the bottom line. I don't continue cases after a case is scheduled for trial unless there's some extenuating circumstance.

This means that even if Bouras had talked to Jennifer *five months* rather than five days earlier and promptly notified

the immigration judge that she would not be able to appear for a hearing on August 7, 2012, the judge *still* would not have changed the date of the hearing; for he had scheduled the hearing for that date more than six months earlier. It was not the delay in conveying the information that she couldn't make the hearing that mattered to the judge, but that the hearing had already been scheduled—whenever. He did not refer this arbitrary policy to a rule or statute, and as far as I know there's no basis for it—it appears just to be his personal rule, his display of arbitrary bureaucratic power ("Oh, it is excellent / To have a giant's strength; but it is tyrannous / To use it like a giant.") Not only is his self-made rule irrational, but he managed to compound the irrationality by overlooking the fact that there *was* an extenuating circumstance—the staffing shortage in Jennifer's place of work. All he said about that was that if she "could not come to court because of her work, then she's not able to come to court. That's the bottom line." In other words, tough luck—and that same fatalism might well have led him to say, faced with proof that Jennifer had had a serious illness that precluded her attendance at the hearing, that if she "could not come to court because of an illness, then she's not able to come to court. That's the bottom line."

I am disturbed by a number of things in the majority opinion, including the statement that "Bouras has yet to explain why he blindsided the judge by waiting until the day of the hearing—indeed, until the end of the hearing—to request a continuance when he knew five days before the hearing that his ex-wife would not be available." Bouras is a taxi driver, not a lawyer. He was represented by a lawyer who specializes in immigration law. It was counsel's responsibility to notify the immigration judge promptly of Jennifer's

inability to attend the hearing. Unfortunately Bouras's lawyer, although as I said he specializes in immigration law, did not represent his client competently.

The majority opinion points out that "Schreiner did not say, and has never said, that even with sufficient advance notice she would not have been able to adjust her work schedule to accommodate Bouras's need for her testimony." But when was she supposed to have said that? As far as appears, she was never asked whether she could adjust her work schedule to accommodate Bouras's need for her testimony. Certainly the immigration judge didn't ask her, or ask Bouras's lawyer to ask her. She was kept in Ohio because her office was down to two staff members and it would take her six to eight weeks to train a new hire to fill the third slot. There is no basis for supposing that she had foreseen this emergency and could therefore have notified Bouras's lawyer of her future unavailability before the immigration judge scheduled the hearing. (Remember that she'd had to have foreseen it six months earlier and immediately notified the immigration judge, in order to have a prayer that he'd grant a continuance, given his "rule.") Though he says that his "rule" does not apply if there is an emergency or some (other) extenuating circumstance, there was an extenuating circumstance; it's difficult to understand how the immigration judge managed to overlook that.

The length of the delay sought by Bouras's lawyer, and the age of the case, may explain the immigration judge's impatience and inattention, along with the fact that like most immigration judges he doubtless is overworked. But there was a simple, economical alternative to granting a multi-week continuance, and that was to arrange for Jennifer to

testify telephonically. She could have done that if need be after work, since Chicago's time is an hour behind Columbus's. The immigration judge should have considered that option, as is obvious from the fact that in reviewing his decision the Board of Immigration Appeals chided Bouras for not having thought to arrange for various persons who submitted affidavits concerning the bona fides of the marriage to testify in person or telephonically. We have heard cases in which the immigration judge had obtained evidence from an expert witness telephonically. See, e.g., *Niam v. Ashcroft*, 354 F.3d 652, 659 (7th Cir. 2004). And with Skype or some equivalent video-type linkup, a telephonic interview is almost indistinguishable from an interview in person; it is face to face, albeit mediated electronically.

The majority opinion notes the complaint of the Board of Immigration Appeals that Bouras "had not clarified whether his ex-wife 'could provide testimony by phone or in-person on a date that would not conflict with her work schedule.'" It is possible that neither Bouras nor his lawyer were aware that witnesses can testify in an immigration hearing by telephone, though Bouras's lawyer had made an appearance in the case by telephone. In any event the immigration judge didn't mention the telephonic option; the Board mentioned it, but that of course was too late. Chapter 4 of the Immigration Court Practice Manual, www.justice.gov/eoir/vll/OCIJPracManual/Practice_Manual_review.pdf#page=67, sets forth a (needlessly) complicated procedure for telephonic testimony. One might expect an immigration judge to have reminded Bouras's lawyer of the procedure, but of course he did not. Or he could just have asked for her phone number and called her. Immigration hearings are informal.

It could be argued that had Bouras wanted Jennifer to testify, his lawyer would have asked the judge to issue a subpoena, and he did not. But when could he have done that? Until five days before the scheduled hearing he and his lawyer expected her to appear voluntarily. When she said she couldn't appear because of her work, the lawyer sought a continuance. When that was denied, it was too late to subpoena her. Nor is it at all clear that the immigration judge would have issued a subpoena. For remember his fatalistic declaration that "If the respondent's wife could not come to court because of her work, then she's not able to come to court." Case closed.

He may have believed that Bouras's lawyer had failed to ask his lawyer to ask that Jennifer be subpoenaed because he feared that she would testify against him. But that is hardly likely, as it would contradict her sworn affidavit and also make her a party to a fraudulent marriage, which might invite criminal prosecution.

Incidentally, the affiants include not only Jennifer but also her sister—the sister's affidavit is particularly moving, and as it is better written than the briefs of Bouras's lawyer I am persuaded that it was indeed written by her and reflects her true beliefs. There is no reason to suspect that either she or Jennifer would have any incentive to perjure themselves in order to obtain citizenship for Bouras. What benefit could they possibly derive from testifying in favor of an illegal immigrant with whom they've had no relationship for years? Bouras and his wife had separated in August 2008, and the hearing was not until August of 2012. Since we know that Bouras could not have bribed Jennifer to marry him, she was in no danger of giving testimony that would

expose her to being prosecuted for being party to a fraudulent marriage with an illegal immigrant.

Jennifer would have been a key witness. Because the case that the marriage was a sham was so flimsy to begin with, her testimony could have put that theory to rest. She had told Bouras's lawyer that she wanted to testify on her ex-husband's behalf, and had she had an opportunity to testify and the immigration judge believed her testimony Bouras would be en route to becoming an American citizen.

Her willingness to testify on his behalf further undermines the inference that the marriage was a fraud perpetrated by Bouras in order to obtain U.S. citizenship. Wouldn't she have known that by now, were it true? Wouldn't the fact that the government is trying to expel Bouras from the United States for contracting a fraudulent marriage get her thinking? Yet she has remained willing to testify that the marriage was genuine, a proposition supported by her sister's affidavit—and no one has suggested that the sister had a motive to lie.

I am perplexed by the statement in the majority opinion that "Bouras never established that Schreiner's testimony would have been significantly favorable to him. The only evidence we have of what she would have said is her affidavit. That affidavit does not undermine the judge's findings that the couple had no joint assets, that their purported tax returns were suspect, and that Bouras had spent most of the marriage apart from Schreiner either in Chicago or Algeria." This contradicts the earlier statement in the opinion that "everyone recognizes that married couples may sometimes need to live apart for a host of reasons. Still, an undocumented alien's brief marriage to a U.S. citizen, during which

the couple spent little or no time together and kept their property and finances separate, raises obvious warning signs for immigration authorities" (citation omitted). I don't get it. Why would such a marriage be inconsistent with the acknowledgment that "married couples may sometimes need to live apart for a host of reasons"—in this case the husband's inability to obtain employment, comparable to his Chicago job, in the state in which his wife was tied down by her job and her children? Also, the suggestion in the passage I just quoted that the couple may have spent *no* time together is manifestly false. Nor did they spend "little" time together. Nor is it unusual for a married couple not to own property jointly—and anyway there is no basis for thinking that Bouras brought *any* assets to the marriage.

I also don't understand the statement in the majority opinion that "there was no inherent inconsistency in the immigration judge's finding that Bouras had failed to meet his burden of proof without making an affirmative finding of a fraudulent marriage. To obtain the discretionary waiver, Bouras had the burden of proving good faith. The government has not taken the further step of trying to prove by clear and convincing evidence that the marriage was in fact fraudulent" (citations omitted). But if the marriage wasn't in good faith, that can only have meant that it was fraudulent. If it was not fraudulent, it must have been in good faith. (And how odd it is to place the burden of proof on the person accused of fraud, rather than on the accuser. It's as if I could sue a person for fraud, present no evidence of fraud, yet it would be his burden to persuade judge or jury that he was not guilty of fraud.)

The immigration judge should have explored the possibility of a telephonic substitute for a continuance, but his failure to do so isn't critical. What is critical is his unexplained failure to recognize the existence of an extenuating circumstance, though it was staring him in the face. Had he noticed it he might have found some basis for deeming it insufficiently extenuating, or decided that he should have been told about it five days earlier, when Bouras's lawyer learned about it. Impatient and unsympathetic, he might think it apt punishment for the lawyer's mistake to order the lawyer's client deported. He failed to give even a minimally reasoned basis for denying the requested continuance, and overlooked the possibility of a telephonic alternative.

The Board of Immigration Appeals did discuss the immigration judge's denial of the continuance, saying that "there is no explanation as to why [Bouras] waited until the day of his scheduled individual hearing to advise that his ex-wife was not available to testify in person," or "why his ex-wife was apparently not provided notice of the hearing until a few days before it was scheduled to occur," or "whether she could provide testimony by phone or in-person on a date that would not conflict with her work schedule," and further that "the record does not reflect that the Immigration Judge denied the requested continuance solely out of concern for case completion goals … . Rather, the Immigration Judge correctly denied the requested continuance for a lack of good cause." And finally: Bouras "has not explained how his ex-wife's testimony would have helped him meet his burden of proving that he entered their marriage in good faith."

The Board's opinion is a garble. The comment about the potential value or lack thereof of Jennifer's testimony makes

no sense. She was prepared to testify on Bouras's behalf, and since they're divorced and he impecunious, she presumably would be a truthful witness and one well positioned to understand at least ex post why he had married her. Her answer to one question that the immigration judge might have been expected to put to her—"would you still be married to him if you two had agreed about having children and getting rid of the dog?"—might have resolved the case one way or the other.

Earlier in this opinion I quoted the passage in which the majority states that "Bouras never established that Schreiner's testimony would have been significantly favorable to him. The only evidence we have of what she would have said is her affidavit. That affidavit does not undermine the judge's findings that the couple had no joint assets, that their purported tax returns were suspect, and that Bouras had spent most of the marriage apart from Schreiner either in Chicago or Algeria." Her testimony might well have undermined those points, but, more important (as those points are not determinative), it would have offset them if her testimony would have persuaded the immigration judge that she and Bouras had expected, and tried, to make a life together.

He didn't give her a chance to testify, because of his arbitrary no-continuance rule, even though he thought her a critical witness, saying: "the critical factor in all this case, and what I, I, I find troubling, is respondent's [having] obtained, not only an affidavit from his ex-spouse, but [also from] her sister and her father, stating that the respondent was married to his daughter and that he visited them together and he saw them. He knew that his daughter was married to the respondent. Plus, an affidavit from a friend.

But they're not, they're not, they're not here to testify and basically, you know, I have to give the affidavits less weight because anyone could feel sorry for the respondent and write an affidavit. The motive to submit an affidavit on someone's behalf may be to help him out because he needs the help for immigration purposes. But I really am forced to decide the issue of whether or not the respondent has submitted sufficient evidence that he intended to make a life together with his spouse when they married. And the only real evidence I see is the affidavit."

So less weight—fine. But he gave the affidavits no weight, despite the weakness of the government's evidence. The majority opinion states that the denial of a continuance must be upheld "'unless it was made without a rational explanation.'" The immigration judge's denial was made without a rational explanation. He said that his policy is to deny a continuance asked for after he has scheduled a hearing (even if it was scheduled six months earlier), unless there is an emergency or an extenuating circumstances—there certainly was the latter, which he ignored completely. Where was the rationality?

Unlike its approach in *Barma v. Holder*, 640 F.3d 749, 751 (7th Cir. 2011), the Board in this case didn't suggest that it was substituting its own ground for denying relief for the immigration judge's ground; rather it was approving his ground. The majority opinion states that "the Board's reasons are properly considered where, as here, the Board agrees with the judge's decision and provides its own supplementary reasoning." But I don't see any supplementary reasoning except for the comment that I called—justly, I think—senseless (that Bouras "has not explained how his ex-

wife's testimony would have helped him meet his burden of proving that he entered their marriage in good faith"). The immigration judge's sole ground for denying relief was that Bouras's hearing having been scheduled, a continuance to allow his ex-wife to testify would not be granted in the absence of an extenuating circumstance. By basing denial of relief on that ground, the immigration judge implied that there was no extenuating circumstance in this case, but he did not say so, and Jennifer's inability to travel to Chicago for several weeks was an extenuating circumstance that could easily have been accommodated by asking her to testify telephonically. The immigration judge articulated no "good cause," as the Board erroneously thought he had, for terminating the case without hearing from Jennifer. And the Board produced no rational supplementation to the immigration judge's defective reasoning.

What is true, and has turned out to be fatal for Bouras—though it should not have been—is that his lawyer was lackluster. He didn't notify the immigration judge promptly that Jennifer would not appear. He did not suggest a telephonic alternative to her appearing at the hearing in person. He did not try to subpoena her. There are some first-rate immigration lawyers, especially at law schools that have clinical programs in immigration law, but on the whole the bar that defends immigrants in deportation proceedings (the bar to which Bouras's lawyer belongs, see "Scott Eric Bratton," *Margaret W. Wong & Associates*, www.imwong.com/about-us/attorneys/scott-eric-bratton/), is weak—inevitably, because most such immigrants are impecunious and there is no government funding for their lawyers. This will not trouble judges so enamored of the adversary system in its pristine purity that they do not blanch when an imbalance in the

skills of the adversaries' lawyers produces an unjust result. It's not as if Bouras, deported to Algeria, will be in a position to sue his American lawyer for malpractice.

Judges are not just umpires. Nor are the judicial officers of the Immigration Court and the Board of Immigration Appeals. Judicial activism is deplored but there is such a thing as excessive judicial passivity, which has been present at all levels of adjudication of Bouras's case.

Bouras's marriage to Jennifer Schreiner failed, but so far as the record shows was bona fide. We should be heeding the analysis of failed versus fraudulent marriage in *Bark v. INS*, 511 F.2d 1200, 1201–02 (9th Cir. 1975) (citations omitted):

> The concept of establishing a life as marital partners contains no federal dictate about the kind of life that the partners may choose to lead. Any attempt to regulate their life styles, such as prescribing the amount of time they must spend together, or designating the manner in which either partner elects to spend his or her time, in the guise of specifying the requirements of a bona fide marriage would raise serious constitutional questions. Aliens cannot be required to have more conventional or more successful marriages than citizens. Conduct of the parties after marriage is relevant only to the extent that it bears upon their subjective state of mind at the time they were married. Evidence that the parties separated after their wedding is relevant in ascertaining whether they intended to establish a life together when they exchanged marriage vows. But evidence of separation, standing alone, cannot support a finding that a marriage was not bona fide when it was entered. … Couples separate, temporarily and permanently, for all kinds of reasons that have nothing to do with any preconceived intent not to share

their lives, such as calls to military service, educational needs, employment opportunities, illness, poverty, and domestic difficulties.

We should grant the petition and vacate the removal order. To refuse to do so is to ratify a prime example of administrative incompetence not limited to the immigration judge and the Board of Immigration Appeals, for I cannot understand the eagerness of the Department of Homeland Security to challenge the legitimacy of Bouras's marriage on such flimsy evidence—an immigrant who has been in the United States for almost 20 years, illegally to be sure (together with millions of other immigrants), yet without engaging in other unlawful activity or failing to earn a modest living by honest labor.